UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT
FILED
MAY 0 1 2007
S.D. OF N.Y. W.P.

-------------------------------------------------------x

DEBORAH LENNON

                        Plaintiff,

        -against-

NOKIA, INC.

                        Defendant.

Civil Action No. 07 CV 343

**AMENDED VERIFIED
COMPLAINT**

-------------------------------------------------------x

Plaintiff, DEBORAH LENNON, by her attorney, HOWARD L. BLAU, alleges
for her Amended Verified Complaint herein, on knowledge of matters relating to
Plaintiff and Plaintiff's own acts, and upon information and belief as to all other
matters and all other persons, as follows:

1.  Upon commencement of this suit, Plaintiff was an individual residing in the State
of New York, County of Westchester.

2.  Upon information and belief, Defendant is a foreign corporation and has its
principal place of business or is authorized to do business in the State of New
York, and maintains its offices in the County of Westchester.

3.  Plaintiff is a highly educated person, having received a Bachelor of Arts degree
in Economics from San Jose State University in 1987, and a Masters in Business
Administration degree from the Haas School of Business at the University of
California at Berkeley in 1989.

4.  Prior to the commencement of her employment with Defendant, Plaintiff had
several years of experience in Channel Recruitment, Development, and Programs, all
of which are terms of art in her field and in the business conducted by Defendant.

5.  A copy of Plaintiff's resume is annexed hereto as Exhibit A.

6.  From 2000 until October 2005, Plaintiff had been employed by Sun

Microsystems, Inc., in Santa Clara, California.

7. At all times before commencing her employment with Defendant, Plaintiff was a domiciliary of California.

8. Plaintiff's highly successful past experience in Channel Recruitment, Development, and Programs combined with her superior leadership skills placed Plaintiff in an advantageous position where these skills and experience were highly in demand and sought after.

9. In or about November 2005, Plaintiff responded to Defendant's Channel Marketing Director Position and began to engage in conversations regarding the possibility of Plaintiff being hired by Defendant and being placed in its New York offices. A copy of the Channel Marketing Director Position that Plaintiff responded to and applied for is annexed hereto as Exhibit B.

10. At Mr. Barry Issberner's request and in furtherance of these conversations as a candidate for the position of Director of Channel Marketing, Plaintiff prepared a "Channel Marketing Action Plan" that was submitted to Defendant, a copy of which is annexed as exhibit C.

11. Subsequently, after submitting the "Channel Marketing Action Plan", Plaintiff flew to New York to have a live interview with Barry Issberner, the Defendant's Hiring Manager and Vice President of Global Marketing. Thereafter, and up until the time the Plaintiff was hired, Plaintiff was interviewed a minimum of six more times live or via phone by Defendant's representatives. These interviewers consisted of Klaus Siebold, Director of Mobility Solutions for Europe, Middle East and Africa; Gord Boyce, Vice President of Enterprise Solutions Sales Americas; Olivier Cognet, Vice President of Strategy and Business Development; Margarete Roos, Director of Headquarter Human Resources; Chris Fletcher, Director U.S. Vertical Marketing; and John Mason, Vice President of Channels. Each and every interviewer had copies of Plaintiff's "Channel Marketing Action Plan" and the main focus throughout each interview was on architecting/developing, developing/implementing a channel/partner framework and programs and partner recruitment as per the job description Plaintiff responded to and applied for.

12. After the aforementioned interviews, Plaintiff sent thank-you letters via email discussing the position Plaintiff was seeking along with the feedback she received

during these interviews.  These emails discuss the fact that Plaintiff's role would be primarily one of developing a Channel/Partner Framework utilizing her vast experience to the fullest and also displays the vast time, effort, and energy spent by the Plaintiff in preparing to work for the Defendant.  These six thank-you letters from the Plaintiff to the Defendant's high level employees who interviewed Plaintiff are in order starting with Mr. Issberner, Mr. Seibold, Mr. Boyce, Mr. Cognet, Mr. Fletcher, and Ms. Roos and are annexed hereto in its entirety as Exhibit D.

13.  Upon further discussions with Barry Issberner, Plaintiff was promised that Defendant understood relocating across the entire country and residing in a brand new state was a life altering decision and gave Plaintiff continuous reassurances that she would be given every opportunity to succeed in this new position with Nokia.

14.  Defendant reassured and promised Plaintiff that Defendant would provide a stable and structured work environment where Plaintiff would be able to display her strong skills in Channel Recruitment, Development, and Programs.  Plaintiff relied on Defendant's actions throughout the entire interview process that she would be assuming all the responsibilities  that came with the Channel Marketing Director Position as based on her interviews, the job description, and the "Channel Marketing Action Plan".  Defendant's representatives made it clear that the development and implementation of a world-class channel partner program was a very strategic initiative and that there was no reason for the Plaintiff to doubt that resources and support would not be in place or allocated.  Given the job description, the voluminous interview discussions, the position's visibility, the level of compensation, and the cost of relocating the Plaintiff, it would be unfathomable for the Plaintiff to assume that Defendant was not going to provide Plaintiff with what she needed to succeed.

15.  As a domiciliary of Northern California, Plaintiff was in the Epi-Center for the high tech industry known as 'Silicon Valley'.  Therefore, with Plaintiff's skills and experience in this field, Plaintiff would have been able to acquire many job opportunities of equal or better pay, without ever having to relocate to New York.

16.  However, on January 7, 2006, Plaintiff relying and being induced to leave her California home and relocate due to Defendant's clear promises accepted the position as Director of Channel Marketing and entered into an agreement with

Defendant.  A copy of the agreement is annexed hereto as Exhibit E.

17.  Also in January 2006, Plaintiff and Defendant entered into a "Relocation Agreement", a copy of which is annexed hereto as Exhibit F.

18.  This Relocation Agreement explicitly states for Plaintiff that: "should I..., be discharged for disciplinary action to include but not limited to unlawful or criminal conduct, falsification of records, physical violence, destruction of company property, improper discrimination, harassment of other employees, including sexual harassment or voluntarily terminate my employment, with Nokia prior to twelve (12) months from the date of relocation, it is agreed I will reimburse Nokia...per the following table:".   There is no provision in the Relocation Agreement for any other termination circumstances which would give Plaintiff reason to expect she would not be terminated other than for sufficient cause.

19.  Therefore, the combination of Defendant's actions and assurances through its representatives along with the aforementioned agreements formed an implied employment contract with the Plaintiff that if indeed Plaintiff accepted Defendant's job proposal and would be willing to move across the country and leave other enticing job opportunities, Plaintiff would not be discharged without sufficient and just cause.

20.  Upon commencing her employment with the Defendant, Plaintiff's ability to perform her duties and tasks for which she was hired was frustrated repeatedly.

21.  Plaintiff made countless efforts to engage John Mason, Vice President Global Channels & Operators, on the philosophical framework and direction her tasks should be focused towards but was given insufficient and inconsistent guidance.

22.  Though Mr. Issberner was Plaintiff's direct manager, Mr. Mason owned the Partner Program and Channel Conferences, and therefore, Plaintiff's effectiveness and success required regular direction and guidance primarily from him.

23.  When the Plaintiff did have an opportunity to speak with Mr. Mason, he would discount what she had to say and give no credence to it.  Examples of such instances occurred in the March 16, 2006 Partner Program Strategy & Structure Meeting in White Plains, NY and also on March 29, 2006 at the continuation meeting in Paris, France.

24. Plaintiff's role as Director of Channel Marketing was continuously being circumvented from beneath her by Mr. Mason.

25. Mr. Mason did not involve Plaintiff in any discussion regarding Distributor or Partner Recruitment Strategies, two areas in which Plaintiff should have played a highly involved role.

26. Mr. Mason gave minimal, inconsistent, and insufficient process directions and approvals regarding the Partner Program Strategies, Development and Management and did not respond or give support to Plaintiff, thereby jeopardizing Plaintiff's launch deadlines and Short Term Incentive Plan (STIP's) goals.  Plaintiff produced minutes and implementation plans designating Mr. Mason's role and forwarded them to him for action but to no response whatsoever.  Also, Plaintiff produced weekly "gaps analyses" asking Mr. Mason for action or support but again received neither.

27. Plaintiff brought her concerns to her manager, Mr. Barry Issberner, Defendant's former Vice President of Global Marketing, informing him of Mr. Mason's on-going inappropriate treatment which was putting Plaintiff in a position where her job was being compromised.

28. Mr. Issberner agreed with the Plaintiff and realized how Mr. Mason was limiting Plaintiff's job duties and therefore was ultimately making her employment very difficult to sustain.

29. Mr. Issberner recognized and confirmed to Plaintiff that Mr. Mason was frustrating Plaintiff's employment with Nokia and that Mr. Mason was mainly responsible for diminishing the scope of responsibilities and control to which he had hired Plaintiff for.

30. On May 4th, 2006, Cori Emonds, Human Resources Manager, conducted a one on one interview with the Plaintiff to discuss the organizational development Work Smarter projects.  The Plaintiff couldn't answer most of her questions because Plaintiff's role was so impacted by lack of direction and cooperation from Mr. Mason.  Ms. Emonds documented this discussion and also expressed concern for Plaintiff's continuing role being diminished by Mr. Mason.

31. In spite of the obstacles and difficulties Plaintiff endured  during her employment, Plaintiff's performance was awarded with a special Nokia Equity Grant

in recognition of her "commitment, professionalism and contribution". Also, in Nokia's six month Review Achievement of the Plaintiff, Mr. Issberner confirmed the challenges Plaintiff faced while also praising Plaintiff's professionalism, expertise and drive, and rewarding her with One-Hundred Percent (100%) results. Also, in this six month Review Achievement, Plaintiff documents her on-going difficult relationship with Mr. Mason. A copy of Plaintiff's Nokia Equity Program 2006 Grant is annexed hereto as Exhibit G. A copy of Plaintiff's Review Achievement is annexed hereto as Exhibit H.

32. On July 11, 2006, Plaintiff met with David Petts, Senior Vice President of Sales and Marketing, John Mason, and Steve Jones to review the Partner Program. In preparation of this meeting, Plaintiff, Jeff Ratzlaff, and Mr. Jones spent much time and effort to put together a presentation to reflect the status of the Channel Program, the many gaps, and the resources needed to launch, implement and manage the program forward. When Plaintiff made her presentation, Mr. Petts quickly indicated the group was on the wrong track and subsequently implemented his own philosophy and design with Mr. Mason's approval displaying another instance of Defendant frustrating Plaintiff's employment.

33. On July 13, 2006, Plaintiff met with Ms. Margarete Roos, Director of Human Resources, to discuss how difficult her first six months being employed by the Defendant had been. Plaintiff discussed the hostile work environment and how Mr. Mason was putting a big disconnect between the role she was hired to do and how limited and distorted that role was becoming.

34. On July 14, 2006, Plaintiff met with Mr. Petts to discuss her concern over the disconnect revealed in the July 11, 2006 meeting and discussed how difficult it had been to work with Mr. Mason up until July 11, 2006 and how he had not involved her in any of the distributor strategy that Steve Jones was working on. Plaintiff assured Mr. Petts how well she had been working with Mr. Ratzlaff and Mr. Jones and was still optimistic that she could work with Mr. Mason. Despite Plaintiff's assurances, within a week Mr. Petts excluded Plaintiff and was holding closed door meetings with Mr. Ratzlaff and Mr. Jones on distribution/distributor strategies, these being duties Plaintiff was hired to have a major role in developing and implementing.

35. On July 25, 2006, and July 31, 2006, plaintiff met with Megan Matthews, Acting Vice President of Global Marketing, to discuss the Channel Program.

Plaintiff discussed how difficult it had been trying to work with Mr. Mason and her concerns about the quality of the program and implementation as a result of Mr. Mason's inconsistent and insufficient guidance and lack of leadership. Plaintiff also expressed optimism that things would improve as Mr. Petts was involved and had formed an Executive Core Channel Team and because a new project plan had been developed and agreed to by John Mason, Steve Jones and Plaintiff during the time period July 12-14, 2006.

36. On August 3, 2006, Ms. Matthews reconfigured Plaintiff's job focus areas. Plaintiff protested and expressed concern that the reconfiguration focused Plaintiff on ancillary tasks and deliverables while allocating her core job elements to two contractors. Ms. Matthews assured Plaintiff that though the two contractors were "responsible" for Channel Program Definition and Implementation, Plaintiff was "accountable" for these areas, and as such, was the decision-maker and the contractors would take direction from Plaintiff. A copy of the August 3rd,2006 email sent by Ms. Matthews to Plaintiff is annexed hereto as Exhibit I.

37. From the beginning of August,2006 up until Plaintiff's termination in November,2006 contrary to Ms. Matthews' assurances, Plaintiff's employment role was increasingly and systematically eroded and even more marginalized making Plaintiff's role primarily one of Marketing Communications.

38. Plaintiff was continuously left out of Channel Program, Implementation, and Distribution Strategy meetings from which she should have been allowed to attend, and in the meetings she was invited to attend, her concerns and input were discounted and discredited. Subsequently, in the weekly Core Team Track Meetings, Plaintiff was limited to covering only the Marketing Communications area, a role which Plaintiff never applied for nor was discussed in any of the interviews before accepting the Director of Channel Marketing position.

39. Plaintiff relied on Defendant's promises and assurances and expected that her job responsibilities would be those primarily outlined in the job description, in the "Action Plan", and in the numerous interviews held before accepting said employment with Nokia. Otherwise, Plaintiff would have never relied on Defendant's promises and relocated across the country to work for Defendant in a "Marketing Communications" role.

40. Upon commencing her employment with the Defendant, Barry Issberner sent an internal email to Nokia  employees introducing Plaintiff to the Enterprise Solutions Division.  In this email, he focuses Plaintiff's job responsibilities on 'defining' and 'implementing' Channel Programs, and not on 'marketing communications'.  It also explicitly states that she "will work most closely with John Mason."  This further substantiates what Plaintiff relied on in relocating to New York and what her job focus was in coming to work for the Defendant. A copy of this February 25, 2006 internal email sent by Mr. Issberner to the rest of Plaintiff's colleagues is annexed hereto as Exhibit J.

41.  Therefore, Defendant frustrated Plaintiff's ability to perform the job tasks for which she was hired which occasioned the following results:

     A.  Precluding Plaintiff from performing the services for which she was hired

     B.  Defendant demanding that Plaintiff repay the portion of the relocation benefits which she has received

     C.  Precluding Plaintiff from collecting the balance of the relocation benefits to which she would have been entitled

     D.  Precluding Plaintiff from earnings and performance bonuses to which she would have been entitled

     E.  Precluding Plaintiff from receiving 401K benefits to which she would have been entitled

42.  In addition to the foregoing, the Plaintiff was forced to incur costs and expenses occasioned by her relocating from California to New York for which Plaintiff should be fully compensated.

43.  Upon accepting the position with Defendant which was contingent upon Plaintiff's agreement to relocate to New York, Plaintiff signed a purchase agreement on March 22, 2006 and paid a ten (10%) percent down payment in the amount of Eighty-Three Thousand Nine Hundred Fifteen dollars ($83,915.00) on a new condominium in Harlem, New York.

44.  Defendant expressed to Plaintiff that they would not be willing to pay for

Howard L. Blau, an attorney licensed to practice as such in the State of New York, affirms the following under the penalties of perjury:

I am the attorney for the plaintiff in this action and I maintain my offices at 29 Broadway, Suite 2222, New York, New York, 10006.

I know the contents of the within Amended Verified Complaint based upon the documents in my file and conversations with my client.

The reason why this verification is made by the attorney for the plaintiff instead of the plaintiff is because the plaintiff is not within the County of New York which is the county where the affirmant has her office.  The affirmant further says that the grounds of her beliefs are based upon information received by the affirmant from the plaintiff.


Dated: New York, New York
        March 21, 2007

Howard L. Blau, Esq.

# DEBORAH A. LENNON

81 South 16th Street, San Jose, CA 95112
Tel: 408-309-4086   Email: lennond@sbcglobal.net

---

**Objective:** Secure the Channel Marketing Director position.

## PROFESSIONAL QUALIFICATIONS

- 14 years of successful high tech experience in channel marketing, development, and programs.
- Strong track record of building and managing distributor, reseller, and partner relationships that achieve financial targets and create substantial positive business impact
- Proven expertise in developing and implementing comprehensive channel marketing programs including partner selection, qualification, recruitment, training/certification, compensation, marketing support, and enablement.
- Highly developed problem solving, negotiating and influencing skills.
- Excellent verbal, written, and presentation skills.
- Superior people management and leadership skills – team player who is persuasive with peers, superiors and partners.
- High energy level and commitment – extremely results oriented self-starter.

## PROFESSIONAL HISTORY  &  ACCOMPLISHMENTS

**Sun Microsystems, Inc., Santa Clara, CA**
**Partner Program Manager, iForce Partner Program Office**                      2003 – Nov. 2005
- Major contributor to achievement of 116% of US FY05 indirect software revenue goal and 180% increase over FY04
- Responsible for the US software partner program – managed approximately $7.0M in financial incentives
- Developed and managed program including partner segmentation/profiling, training and certification, participation criteria, incentives, and enablement
- Transitioned and integrated acquisition partners and incorporated channel best practices, e.g. Waveset and See Beyond
- Re-architected and integrated SunONE partner programs into unified iForce partner framework during FY04, e.g. merged and aligned programs and order administration, revenue tracking/reporting, partner databases, contracts, application process, communications, and web portals
- Worked with BU and product marketing to develop and introduce Java Enterprise System subscription business model into the channel with focus on partner certification, compensation, and engagement

**SunONE Retail Sales Development Manager, EMEA (Europe, Middle East, Africa)**            2002
- Responsible for StarOffice EMEA  retail sales – achieved 100% of revenue target for FY03
- Worked closely with BU and product marketing to validate business and channel model changes and marketing programs and to ensure alignment with overall SunONE sales objectives
- Worked with product engineering team to evaluate and introduce relevant new features and functionality
- Reported to VP Sales for EMEA SunONE / Java Web Services

**Group Manager, Worldwide Sales Development, Webtop and Application Software Group**          2000 - 2002
- Developed and implemented successful 1- and 2-tiered reseller and OEM channel programs including identifying, contacting, and recruiting partners; managing new version/product launches;  and administering cooperative marketing programs and funds for StarOffice shrink-wrapped and license products
- Primary FY02 objectives were to establish StarOffice OEM business and penetrate enterprise markets while growing retail sales – achieved 138% of FY02 revenue targets and 147% of MBO target points
- Primary FY01 objective was to recruit distributors and resellers worldwide for shrink-wrapped products – established StarOffice distribution in 34 countries and achieved 187% of sales and penetration goals
- Managed, coached, motivated global team of 10 professional sales managers – achieved top ratings in management feedback survey

**Shoreline Communications, Inc.,** Sunnyvale, CA – VoIP / IP telephony start-up                                1999
**Field and Channel Marketing Manager**
- Responsible for channel and direct sales enablement with focus on defining sales methodologies and cycles
- Created programs, sales tools, and training for partners and enterprise sales team
- Worked with marketing to develop channel marketing materials
- Developed and managed integrated marketing programs including  telemarketing and inside sales campaigns focused on generating highly-qualified leads

**3Com Corporation,** Santa Clara, CA                                                                          1998
**Worldwide Channel Marketing Manager, Storage Networking Division**
- Developed channel strategy and programs to achieve entry into SAN solutions market
- Responsible for partner selection, recruitment, and training
- Provided channel partners and enterprise channel sales team with sales tools and marketing materials
- Worked with marcom to create channel and end-user programs and promotions to increase brand awareness and generate demand

**Founder of international sales and marketing consultancy**                                                    1996 -1998
Served two clients in the following roles:
Wyse Technology GmbH, Grasbrunn-Munich, Germany
**Acting General Manager and Director of Sales for Central Europe**
- Managed sales, marketing and finance organizations from German office
- Achieved annual revenue target of $20.0M -- increased new thin-client (WinTerm) product line revenues 300%
Katz Media S.A.R.L., Paris, France
**Acting Director of Sales Operations, Europe**
- Developed retail distribution and VAR channels strategy including pricing, order administration procedures and processes, credit policies, terms, and conditions
- Responsible for evaluating vendors in terms of their sales operations and logistical value-add

**Sun Microsystems, Inc.,** Mountain View, CA                                                                  1994 -1996
**Sales Development Manager, SunSoft Intercontinental Sales**
- Focused on building Solaris on Intel and PowerPC business through channel and partners in Asia-Pacific, India, Africa, Middle East and Latin America -- region achieved 115% of FY96 revenue goal

**Wyse Technology, Inc.,** San Jose, CA                                                                        1991 -1994
**Country Manager, Poland**
- Managed sales office in Warsaw with 4 employees -- achieved quarterly quota with revenues of $1.8M through distribution and OEM channels
**Distribution Sales Manager, Middle East**
- Grew business through distributors 100%  to approximately $8.0M in annual revenues
**Sr. International Account Manager, Central and Eastern Europe**
- Supported distributor, VAR and OEM sales -- $48.0 in annual revenues
- Assisted in establishment and operation of Eastern European offices and recruitment of distributors and VARs

**Hay Management Consultants,** Walnut Creek, CA                                                               1989 -1991
**Associate Consultant**

## EDUCATION

**M.B.A.**              emphasis in Marketing, GPA 3.7, May 1989
                        Haas School of Business, University of California at Berkeley, CA

**B.A. Economics**      awarded with Great Distinction, GPA 3.9, May 1987
                        San Jose State University, CA

**Channel Marketing Director Position**

TO QUALIFY FOR THIS ROLE YOU MUST COME FROM A TECHNOLOGY COMPANY BACKGROUND
AND HAVE EXPERIENCE DEVELOPING AND IMPLEMENTING CHANNEL MARKETING PROGRAMS
RELATED TO THE RECRUITMENT AND DEVELOPMENT OF CHANNEL PARTNERS.


In this role the qualified candidate will help develop and craft the channel
marketing programs and materials related to the recruitment and development
of channel partners including IT Distributors, VAR's, ISV's, and SI's.
Operator B2B sales and marketing operations are a secondary, but important
target as well. Programs include, prospect partner identification & contact
programs, partner recruitment kits, certification criteria & terms,
education/enablement criteria and terms, coop marketing funding criteria &
terms, brand mark utilization criteria & terms, partner recruitment &
development event strategies, partner product educational opportunities &
criteria, and any other partner related marketing materials.

Works in close cooperation with the Head of Channel Sales, Head of
Marketing, Regional Sales leaders, and all Business Unit product marketing
leaders.


Areas of accountability:
• Identify and prioritize prospective channel partners• Structure & coordinate initial prospect qualification program
• Structure & deliver recruitment kits
• Update channel certification program
• Structure cooperative marketing funding program & manage implementation of
accounting & auditing processes
• Build consensus view on overall program goals, metrics for success, and
status reporting process
• Oversee successful new product/technology introductions to channel in close cooperation with Channel sales & BU's
• Oversee channel marketing promotion/incentive programs
• Establish channel marketing team structure, oversee recruitment of future
members, manage team performance


Needed Competencies and Skills:
Required Background and Experience:
• 8-10+ years experience in IT channel marketing
• Successful track record of developing & implementing channel marketing
programs

- Direct experience in managing channel conflict issues, including anticipating issues and establishing programs to prevent their occurrence
- Strong written, presentation & project management skills
- Self-starter, team player

# Channel Marketing Action Plan

Submitted to:
Barry Issberner
VP Global Marketing
NOKIA
Enterprise Solutions

Prepared by:
Deborah Lennon
Candidate for the Director Channel Marketing position

NOTES:
- This Action Plan is based on our telephone conversation Friday, 18. November, and is an overview of how I would approach the job of architecting an effective world-class global channel framework and program(s) for Nokia's Enterprise Solutions division.
- This is a preliminary plan that touches on some of the major elements and issues that will need to be addressed. It will be enlarged upon and refined as I learn more about Nokia's businesses, resources, challenges, and objectives.
- This plan requires information/input and support from channel sales, marketing, product marketing, sales operations, finance, legal, and current partners for each geography (i.e., North America, Latin America, Europe-Middle East-Africa, and Asia-Pacific)

Evaluate the current channel, program and partners
- The current program and channels were inherited via the Ramp Networks acquisition and are running on auto-pilot — it's important not to break or cannibalize these prematurely
- Need to understand what works and what doesn't — best practices should be identified and possibly integrated into new program(s)
- Need to determine which, if any, partners will migrate to new channel programs
  - If some partners are to be migrated, we should profile them, assess their value and business models and incorporate this into target partner segments and profiles
- Look at current Nokia distribution and partner legal distribution agreements, authorization letters, business terms and conditions, exhibits, etc.
  - Understand what timing and steps must be taken to notify/terminate partners
  - Retain best practices and/or corporate "must haves"

Understand Nokia enterprise solutions, products and services (support and consulting)
- Features, functionality, performance, competitive positioning
- Where do products/solutions fit horizontally and vertically?
- What is end-user value proposition?
- Develop partner value propositions, e.g. Superior products/solutions/performance, emerging technologies/solutions, growth area, competitive advantage, high brand awareness

<u>Understand how solutions/products currently get to market. i.e. order process. flow, fulfillment. reporting</u>
- How are they priced and price-listed?
  - Partner margins and/or discount structures? How do they compare to competitors' margins/discounting?  Are they industry standard and/or sufficient/generous to the channel?
  - Are there authorization or certification requirements to purchase certain products/solution?
  - Are there minimum order levels, volume pricing, cross-selling discounts/incentives?
  - How is special/deal pricing managed and approved?
- How are they packaged, delivered (i.e., boxed product, right-to-use licenses, site licenses, subscriptions, etc.)
- Are multi-vendor solutions bundled? are they price listed by Nokia?  Or are partners expected to have multi-vendor relationships and to integrate the solution
- What are the reporting requirements in terms of systems and timing?
- What logistical value-add do current distributors contribute?  What would be optimal value-add?
- What challenges do Nokia's systems and operational processes present to current and prospective distributors?
- How do competitors operate?

<u>Segment and profile distributors</u>
- Consider distributor expertise, skills, staffing (i.e., dedicated reps or business development), partner communities, marketing value-add (i.e., programs, campaigns, events capabilities),  training capabilities, operational, logistical and reporting systems, vendor relationships,  support and services offerings, hardware/software/services breakdown, market penetration, revenues, business practices and models, and geographic coverage

<u>Segment and profile partners, e.g., ISVs, VARs, SIs, Operators, ASPs</u>
- Consider partner expertise, skills, training/certifications/accreditations, value-add, vendor relationships, solutions offerings, support and services offerings, hardware/software/services breakdown, customer bases and market penetration, revenues, business practices and models, and geographic coverage

<u>Scope out the Channel Structure/Framework and Policies</u>
- Define partners' roles in sales cycle, processes, integration/deployment, and delivery of services
- Define Rules of Engagement
  - Publish them
  - Keep them simple and do-able
  - Ensure they're aligned with direct sales and partner compensation and benefits
  - Avoid channel conflict
- Decide whether partners will have direct purchase option, and if so, when and at what pricing/discount levels; or, allow purchase only through distributors

- Determine whether to tier partner programs – no more than 3 tiers
  - Ensure you have real differentiation in terms of participation criteria and benefits for each tier
- Determine what competencies are required to purchase/sell which products and which solutions
  - Keep in mind you want to enable selling – is it critical to have this competency to sell the products?
  - Can you get partners to this level of competency with training/certifications/accreditations?
- Determine what competencies and/or level of technical proficiency is required to integrate, deploy, and/or deliver services for which products and which solutions
  - Is it critical for partners to be technically proficient and certified to integrate, deploy and/or deliver services?
  - Keep in mind that certifications must offer partners a significant ROI
    - Vendor-specific certifications cost time and money (billable hours AND lost opportunities)
  - Can you get partners to this level of competency with training/certifications/accreditations?

Develop Distributor Program
- Define participation criteria/requirements – consider these areas:
  - Geographic coverage
  - Minimum annual sales
  - Credit worthiness/approval
  - Named resources
  - Training
  - Account management
  - Business planning
  - Market development
  - Pre- and post-sales support
  - Operational requirements and policies
- Define benefits and compensation – consider these areas:
  - Product/solutions/services authorization
  - Relationship support
  - Financial incentives
  - Marketing communications and support
  - Partner enablement
- Develop compelling distributor business proposition
  - What's in it for the distributor?
  - Why should they take on new vendor or new products/solutions?
- Develop or tune application and approval process
- Publish program guides

Develop Partner Program(s)
- Define participation criteria/requirements tailored to each segment/partner type and tier of partner – consider these areas:
  - Geographic coverage/restrictions

**Subject:** Nice meeting you!
**From:** Deborah Lennon <lennond@sbcglobal.net>
**Date:** Thu, 01 Dec 2005 10:58:40 -0800
**To:** barry.issberner@nokia.com

Hi Barry,

Thank you again for your time yesterday.  I enjoyed meeting you and am impressed
with your expertise, passion and energy -- I think we'd work well together.  I also
wanted to reiterate that the calls I had with Klaus Seibold and Gord Boyce and the
meeting with Olivier Cognet were very interesting.  Each of them has a unique
perspective on the business and what types of partners would be effective.  I
believe I demonstrated to them that I understand the diverse issues and priorities
facing the Enterprise Solutions group and that I have the skills and background in
channels and programs to effectively address them.  I hope Klaus, Gord and  Olivier
are as positive about me as I am about them.

I'm very  excited about this position -- it's an ideal fit to my qualifications and
it offers the challenge and high impact that I thrive on.  I look forward to the
next round of telephone interviews Elizabeth is arranging for next week.  I will
forward contact info for my references to you later today.  If there are any
questions that crop up in the meantime, please don't hesitate to contact me.

Best regards,
Deborah

**Subject: Vielen Dank!**
**From: Deborah Lennon <lennond@sbcglobal.net>**
**Date: Thu, 01 Dec 2005 12:26:28 -0800**
**To: klaus.seibold@nokia.com**

Hello Klaus,

I just wanted to take a moment to thank you for your time yesterday and for sharing
your insight into some of the challenges and issues I would face as the ES Channel
Marketing Director.   I have a clearer picture of the job requirements and
objectives, and I believe I have the expertise and background to architect and
deliver the  world-class channel/partner framework and programs Nokia's Enterprise
Solutions group requires.   I'm very excited about this position -- it's a unique
opportunity to have high impact and it will utilize the full spectrum of my channel
development, management and programs experience while leveraging my background in
hardware and software technologies and products.

I hope to have the opportunity to work with you.   If you have any additional
questions for me, please don't hesitate to contact me.

Sincerely,
Deborah

**Subject:** Vielen Dank!
**From:** Deborah Lennon <lennond@sbcglobal.net>
**Date:** Mon, 05 Dec 2005 16:14:07 -0800
**To:** margarete.roos@nokia.com

Hello Margarete,

I just wanted to take a moment to thank you for your time today and for sharing your insight into the Enterprise Solutions group strategy and the Channel Marketing Director position.  I believe I have the expertise and background to architect and deliver the  world-class channel/partner framework and programs Nokia's Enterprise Solutions group requires.  I'm very excited about this position -- it's a unique opportunity to have high impact and it will utilize the full spectrum of my channel development, management and programs experience while leveraging my background in hardware and software technologies and products.


I hope to have the opportunity to work with you.  If you have any additional questions for me, please don't hesitate to contact me.

Sincerely,
Deborah

# NOKIA

January 5, 2006

Deborah Lennon
81 South 16th Street
San Jose, CA 95112

Dear Deborah:

On behalf of Nokia Inc, I am very pleased to offer you the position of Channel Marketing Director reporting to Barry Issbemer based at our White Plains, NY location.

Your initial salary will be calculated based upon the biweekly rate of $6,730.77 ($175,000.00 annually) paid in equal installments. In addition to your salary, you will be eligible to participate in Nokia's Short Term Incentive Plan (STIP) with a targeted annual payout of 25% of your base salary. The STIP incentive periods run from January–June and July–December, with payout following each period based on the accomplishment of corporate and individual goals and objectives and revenue targets.  This bonus is prorated to your start date.

You will be eligible for all standard Nokia Inc. benefits beginning on your start date, which includes eligibility to participate in the company's medical and 401K plans and an initial vacation grant of 15 days (prorated to start date).  Additionally, you will be eligible for 12 paid company holidays (of which 5 days are floating) and 10 family health days annually (prorated to your start date).

You are eligible to receive relocation assistance.  Please refer to the attached summary for information. Relocated employees are required to sign a Relocation Agreement which outlines repayment responsibility should termination occur within one year of relocating.  Please sign and return the Relocation Agreement with your signed offer letter.

We will recommend to the appropriate corporate officials that you be offered an Equity Award consisting of Stock Options and Performance Share Units from the Nokia Equity Plan 2006**.  This recommendation is subject to approval by the appropriate corporate officials

If approved, the stock option portion of the equity award will be priced according to the guidelines.

If approved, the stock option portion of the equity award will be priced according to the guidelines.
- If you begin employment with Nokia between January 1 and June 30, 2006, your Stock Options will be priced based on the trade volume weighted average Nokia share price on the Helsinki Exchanges the first full week of May, 2006.

Any Equity Awards offered to you are subject to the terms and conditions set forth in the Nokia Equity Program 2006.

*The Nokia Equity Plan 2006 is subject to approval at the 2006 Annual General Meeting according to Finnish legal requirements.

**Nokia may, in its sole discretion, use for the settlement of the Grant one or more of the following: newly issued Shares, Nokia's own existing Shares (i.e. treasury stock), Shares purchased from the open market, or, in lieu of Shares, cash settlement.

# NOKIA

In order to comply with the Immigration Reform and Control Act of 1986, you are required to produce documents which will prove your legal right to work in the United States. Your employment with Nokia Inc. is contingent upon verification of employment authorization.

Your employment is also contingent on completion of a standard background check, pre-employment drug screen, verification of information supplied on your employment application and related documents and depending upon your position, clearance pursuant to our Deemed Export Guidelines as required by the United States Department of Commerce Bureau of Industry and Security Export Administration. Nokia reserves the right to withdraw its job offer based on information discovered during the pre-employment screening process.

At the time of acceptance of this offer of employment and prior to your beginning employment with Nokia Inc. you will be required to sign a confidentiality agreement relating to protection of all Nokia Inc. confidential and proprietary information. This offer is contingent upon verification that your employment at Nokia Inc. will not result in a violation of any such agreements.

Nokia is subject to Section 503 of the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, (VEVRAA) which require affirmative action be taken to employ and to advance in employment qualified individuals with disabilities, as well as Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans. Solely to help us comply with Federal and State Equal Employment Opportunity record keeping, reporting and other legal requirements, we request that you read and complete, if appropriate, the attached data information form and return it with your signed offer letter.

You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the company. Likewise, the Company may terminate your employment at any time with or without cause or advance notice. This at-will employment relationship cannot be changed except in writing signed by the Vice President of Human Resources.

This letter supersedes any other agreements or promises made to you by anyone, whether oral or written.

This offer will expire January 9, 2006. If you are unable to respond by this date, please call me at 781-993-3900. As confirmation of your acceptance, please sign and return a faxed copy of this letter and enclosed documents to Ron Goschwer at 914-368-0500.

Deborah, we look forward to you joining Nokia Inc. and strongly feel that your background and experience will be a great asset to the company.

Please don't hesitate to contact me if you have any questions or concerns regarding the content of this offer.

Sincerely,

Tiffany Holmes
Staffing Consultant

I accept the terms of employment stated above:

_Deborah A. Lemon_   _1/7/06_
Name    (new hire)              Date

_1/23/06_
Anticipated Start Date

41



## RELOCATION AGREEMENT

I, __DEBORAH A. LENNON_____, acknowledge that as a condition of my employment and/or career development, I am being relocated together with my family and household effects at the expense of Nokia.

I further acknowledge a report of direct expenses incurred as a result of this relocation will be reported to the appropriate Federal and State tax agencies by Nokia and reflected on my earnings statements. I fully understand that I must declare such income for the tax year during which the expenses are incurred.

I further acknowledge should I fail for any reason under my control to begin the assignment on the designated date, be discharged for disciplinary action to include but not limited to unlawful or criminal conduct, falsification of records, physical violence, destruction of company property, improper discrimination, harassment of other employees, including sexual harassment or voluntarily terminate my employment, with NOKIA prior to twelve (12) months from the date of relocation, it is agreed I will reimburse NOKIA for any and all expenses, including tax liability paid to me or on my behalf, related to my relocation per the following table:

| | |
|---|---|
| 8 - 9 Months | 57.1 % |

Finally, I authorize Nokia to withhold in the maximum amount permitted by law, payment of any and all moneys due me in the nature of wages, vacation pay, commissions, bonus, reimbursable business expenses or any other compensation due me, and may use all other available means to satisfy this obligation. I agree if the foregoing withholding is insufficient to liquidate this obligation, then the balance shall become immediately due and payable without notice or demand. I also agree that I will be responsible to pay any legal expenses associated with the collection of this debt.

_DGL_ I understand, agree, and accept the terms of this agreement, and acknowledge that this schedule for repayment is not intended to create, and does not create, an employment contract or a guarantee of continued employment.

_DGL_ I have read and acknowledge the terms and conditions set forth in the NOKIA Relocation Policy.

__1/7/06_____
Date

__Deborah A. Lenn___
Signature

_____
Date

_____
Signature

**Lennon Deborah (Nokia-ES/NewYork)**

| | |
|---|---|
| **From:** | equity@nokia.com |
| **Sent:** | Wednesday, May 10, 2006 3:09 AM |
| **To:** | Lennon Deborah (Nokia-ES/NewYork) |
| **Subject:** | 2006 Equity Grant to you: A message from Jorma Ollila |
| **Importance:** | High |
| **Attachments:** | PS_2006_Nokia_409A_Amendment.pdf |

NOKIA CORPORATION

NOKIA STOCK OPTION PLAN 2005 and NOKIA PERFORMANCE SHARE PLAN 2006

THE ENCLOSED DOCUMENTS CONSTITUTE PART OF PROSPECTUS
COVERING SECURITIES THAT HAVE BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933, AS AMENDED
The date of this prospectus is March 30, 2006

**PERSONAL AND CONFIDENTIAL**

# Dear colleague,

I would like to personally congratulate you for being selected by your manager to receive a grant under the Nokia Equity Program 2006 ("Grant"). This Grant is a special reward in recognition of your commitment, professionalism and contribution. You play an important role in helping Nokia exceed our business objectives, delight our customers and meet the expectations of our shareholders. The specifics of your Grant award are:

Grant Amount of 2006 Performance Shares: 400

Grant Amount of 2006 2Q Stock Options: 1600

Equity is an opportunity for you to increase your ownership in Nokia. It links your contributions to the future of our business, our long term success, and ultimately increased value for our shareholders. This is just the beginning - the opportunities are all yours for the making.

To learn more about your Grant, please see the section below, which contains details and links to information about the 2006 Equity Program, including relevant country-specific information.
Sincere Regards,

Jorma Ollila

5/12/2006

# Review Achievement of Lennon, Deborah
## for 23-Jan-2006 to 30-Jun-2006

| | | | |
|---|---|---|---|
| **Manager:** | Roos, Margarete | **Business Group:** | Enterprise Solutions |
| **Last Modified:** | 15-Aug-2006 | **Business Team:** | Enterprise Solutions |
| **Objectives:** | Accepted by you 25-Mar-2006 | **Business Team Multiplier:** | 1.10 |
| | Approved by Issberner, Barry 20-Apr-2006 | | |
| | Approved by Petts, David 12-Jun-2006 | **Annual Target Incentive %:** | 25.00 |
| **Review:** | Approved by Roos, Margarete 15-Aug-2006 | **Annualized Adjusted %:** | 27.50 |
| | Approved by Petts, David 15-Aug-2006 | **Payable %:** | 11.98 |

## Short Term Incentive Plan (STIP)Objectives

| Objective Description | Weight | On/Off | Min | Target | Max | Result | Score | Incentive% |
|---|---|---|---|---|---|---|---|---|
| Develop preliminary channel partner framework -see attached | 35 | | 1 | 100 | 150 | 100 | 100 | 8.75 |

<u>Measurement</u>
**Minimum:**
**Target:**
**Maximum:**

**What has been achieved (outcomes, quality, deadlines)**
Secured initial agreement /approval on framework at three meetings/concalls:
On 3/16/06 met in NY with Barry Issberner, John Mason, George Mayes, Christine Bolles, Donna St. Denis, Linda Steiner, Lisa Pederson, Chris Fletcher, Jeff Ratzlaff. Jarmo Hostio, Daren Ng, Nanhi Singh, Sarah Kemp, Lydie Perrin, and Jukka Jyranoja were on the phone. (see attached meeting minutes)
On 3/29/06 met in Paris with John Mason, EJ Koedijk, Jarmo Hosio, Sarah Kemp, Chris Proctor, and Lydie Perrin. (see attached meeting minutes)
On 4/5/06 lead concall with YK Mak, Daryl Ng, Alex Ho, Denis Sullivan, Gene Schmidt. Mathia Nalappan and Jerry Huang delegated call to regional attendees.
Thereafter I regularly kept regional marketing and channel marketing updated with revisions to the framework and details as they evolved.
Presented via phone to David Petts, John Mason, and Jeff Ratzlaff on 4/10 and secured David's agreement/approval

I presented to Francois Bornibus on 6/ 8/06 and secured his agreement/approval. I did not present to him earlier as John Mason was securing EMEA sales buy-in throughout the process.

Issberner - Deborah has done a good job of defining the framework elements needed for our new channel program. She is familiar with the issues here and is driving to get these defining decisions closed.

| Objective Description | Weight | On/Off | Min | Target | Max | Result | Score | Incentive% |
|---|---|---|---|---|---|---|---|---|
| Develop detailed channel partner program implementation plan - see attached | 30 | | 1 | 100 | 150 | 100 | 100 | 7.50 |

<u>Measurement</u>
**Minimum:**
**Target:**
**Maximum:**

**What has been achieved (outcomes, quality, deadlines)**
Please see attached.
Implementation planning is still in process and was changed during my meeting in Paris 6/7-8 with John Mason. I am in the process of publishing the changes and securing agreement/approvals. Also, gaps in tools and process which are currently under review have a great impact on implementation and need to be resolved before we can finalize implementation plans..

Issberner - Deborah's implementation planning has been good in my view. This has been done without strong support from theregional teams as expected. I have discussed this issue with the regional team leaders and this

that this is a consolidated program. I have discovered that there are significant regional and country nuances to execution and process that must be taken into account and understood. Compounding this complexity is a significant gap in the tools, processes and resources required to launch and manage the partner program. I have spent a very significant amount of time trying to identify and engage internal shareholders to secure their agreement and have found that once I engaged teams, they are very positive, but that the lack of defined and committed tools, process and resources preclude their full buy-in. What has also been a challenge is that the program is being developed with very limited resources (me, Tania Gray, and Regional Channel Marketing Managers) simultaneously to securing agreement and buy-in with the result that the program evolves continuously while many of the core requirements and benefits have yet to be funded or populated. It has been very difficult to work on both the internal socialization and the actual program details as both are full-time jobs.

**Employee / Manager feedback (communication, co-operation, expectations, etc.)**
**Issberner, Barry's Comments**
B.I., 07-Jul-2006: Issberner - In my view, Deborah is obviously very familiar with all elements of Channel Development programs and has a very complete plan of attack. Getting through all the decisions necessary to bring our vision into reality has been a challenge. Much of this is out of Deborah's direct control. I have advised Deborah on how to deal with the obvious frustrations that this brings up and she has adjusted her style appropriately in my view. The pressures on the whole channel team are only going to increase in Q3 as we close in on the live Channel Conferences. A review with David Petts is schedule for next week and should help identify how to close the remaining open issues. I am confident Deborah has the experience and drive to do her part here.

**My Comments:**
D.L., 13-Jun-2006 : Employee/manager feedback has been a challenge in that my direct manager is not the owner of the partner program or accountable for the Channel Conferences. Barry has been very supportive when I asked his guidance, but John Mason owns the program and conferences, and my effectiveness and success require direct guidance and direction from him. Without regular guidance and direction from him, it was difficult to know or meet his expectations (though I believe I have). He is new to Nokia and is understaffed and based in a time-zone that was 9 hours ahead of mine making it very difficult to communicate and align. He has alot on his plate with the entire distribution and channel strategy with the Partner Program being just one piece of the puzzle. I am hoping it will be easier to communicate and align with John once we are both based in White Plains.
D.L., 13-Jun-2006 : I

## Attachments

| Name | Type | Size | Date Uploaded | Uploaded By |
|---|---|---|---|---|
| Minutes from meeting March16_06 | .doc | 75KB | 13-Jun-2006 | D.L. |
| Minutes from EMEA meeting March 30_06 | .doc | 87KB | 13-Jun-2006 | D.L. |
| Implementation Timing & Summary 052706 | .xls | 37KB | 13-Jun-2006 | D.L. |
| Partner Program Implementation Timing Summary 050406 (2) | .xls | 18KB | 13-Jun-2006 | D.L. |
| Channel Program launch documents DLcomments May30 2006 | .doc | 88KB | 13-Jun-2006 | D.L. |
| Nokia for Business Global Partner Program Brochure DL input | .doc | 76KB | 13-Jun-2006 | D.L. |
| channel strategy update for BGB 6-2006 | .ppt | 100KB | 13-Jun-2006 | D.L. |
| Americas Channel Conferences Update 053106 | .ppt | 72KB | 13-Jun-2006 | D.L. |
| Your exclusive personal invitation - Nokia EMEA ES Channel Conference 2006 | .htm | 5KB | 13-Jun-2006 | D.L. |
| RE APAC Channel Conference Update 051306 | .rtf | 200KB | 13-Jun-2006 | D.L. |
| RE APAC Channel Conference Update 051306 | .rtf | 200KB | 13-Jun-2006 | D.L. |
| GC Channel Conferences Update 061306 | .ppt | 71KB | 13-Jun-2006 | D.L. |
| FW SPEAKER Invitation Agenda - ES Sales Conference (AMERICAS) | .rtf | 448KB | 13-Jun-2006 | D.L. |
| Channel Conferences 2006 Agenda Framework(DRAFT4) | .doc | 215KB | 13-Jun-2006 | D.L. |
| EMEA Channel Conferences Update 060206 | .ppt | 1018KB | 13-Jun-2006 | D.L. |
| 1H06 STIP Deborah Lennon Final Rev 3.0 | .ppt | 53KB | 25-Mar-2006 | D.L. |

## Readers
No Readers

**Lennon Deborah (Nokia-ES/NewYork)**

| | |
|---|---|
| **From:** | **Matthews Megan (Nokia-ES/NewYork)** |
| **Sent:** | **Thursday, August 03, 2006 11:47 AM** |
| **To:** | **Lennon Deborah (Nokia-ES/NewYork)** |
| **Subject:** | **FW: **email I will send to John** |

Deborah,

- this is redefining your focus areas as part of your job.

See CAPS BELOW

Come seem after your call ends.

Rgds,
mm

| | |
|---|---|
| **From:** | Lennon Deborah (Nokia-ES/NewYork) |
| **Sent:** | Thursday, August 03, 2006 7:42 AM |
| **To:** | Matthews Megan (Nokia-ES/NewYork) |
| **Subject:** | RE: **email I will send to John |

Hi Megan,
This looks good as long as it is meant to delineate focus areas and refine my current job description vs replace it.  A few things it doesn't address include: THEY DO BUT MORE GENERALLY IN PROGRAM DEFINITION. YOU DEFINE THE WHAT - BUT THE GAP IS THE HOW IS THIS GOING TO HAPPEN - WHICH IS WHERE KAREN AND FRAN COME IN WITH JEFF.
- The implementation of the program, i.e. registration/migration of partners into the new program including  tools (where/how/when do they register) YOU WOULD CONSULT ON THIS STUFF, NOT OWN IT, JEFF HAS BEEN BROUGHT IN FOR TOTAL PROGRAM MGMT AND BRING EVERYONE TOGETHER. YOU CAN'T MANAGE THIS ON YOUR OWN, process (timing, audit/verification of training history and other data we collect from partners, approvals and processes, nofitification to partners  (e.g., who in Global and Regional Channel Marketing and Sales, in what sequenceAGAIN, CONSULT.) NOTIFICATION : THIS IS PART OF THE COMMS FRAMEWORK
- The ongoing management of the program, i.e. auditing and maintaining compliance, notifying CAMs and partners, escalating exceptions). THIS IS WHAT JACKSON IS FOR.
My additonal comments/thoughts/questions are enclosed in ** below your items.
Also, if possible could we hold off sending this out to John until maybe Friday morning so we can discuss sometime today?
Regards,
Deborah

| | |
|---|---|
| **From:** | Matthews Megan (Nokia-ES/NewYork) |
| **Sent:** | Wednesday, August 02, 2006 10:29 PM |
| **To:** | Lennon Deborah (Nokia-ES/NewYork) |
| **Subject:** | **email I will send to John |
| **Importance:** | High |

Deborah,

Here is what I intend to send to John and cc to Jeff and Jeff based on our discussion on Mon. Let me know if you have any comments and I will send out first thing Thurs am.

Rgds,
mm

Hey Guys,

1

After talking to many involved in the channel project and getting a good sense of how Marketing can support the rollout of the program, I suggested key areas of focus to Deborah to insure a strong channel program launch with an aggressive and thoughtful 'move forward' to support our future aspirations and LRP targets.

In addition to the ideas I floated with you last Thursday, these are the areas that Deborah and I agreed would be her primary focal points. In addition, she would continue to be a strong contributor within the streams where needed.

The open issue is aligning this work with the resources recently added to the channel team by Jeff (Karen Diguer and Fran Thorpe) and Deborah's contractors as well as Marketing Services.

1. **Communication Framework:** Develop the plan (what, who, when, where, how), key messaging and appropriate deliverables for communicating the program to ES sales, CMO sales, relevant ES and CMO management, current channel partners, future channel partners (based on targets), ES employees and support Theresa Parenteau with content for media communciation program (that Theresa would own). (Suggested partner: Karen Diguer & Marketing Services) ** Is this primarily in support of the launch?** THIS IS FOR THE LAUNCH AND ON AN ONGOING BASIS I.E. FOREVER.

2. **Program Definition:** Continue to develop criteria + benefits, recruitment process, management process for the remaining channel partner types (disty's/B2B operator etc)
     - Define and drive the development of the content for the sales tools we will provide to the channel partners in all categories. Includes and inventory and defining a process for creation & delivery (suggested partner: Karen Diguer + Marketing services).
** ACCOUNTABLE AND YOU NEED TO AGREE HOW KAREN IS RESPONSIBLE AND/OR MARKETING SERVICES FOR TOOLS, PROCESSES, DELIVERY

3. **Metrics & Measurement for initial program launch:** Define dashboard and input/output mechanisms for reporting by areas/countries to insure success at launch and during the lifetime of the program. (suggested partner: Stephen Lakatos, Karen Diguer)

4. **Strategy for evolution of the partner program to meet our 2009 aspirations:** Develop the timeline and evolution of the partner program.  This would include building the partner program framework through 2009, benchmark against competitive and market trends, research 50 partners and incorporate into program framework roadmap.
     - This would include establish the criteria and measurement process for the effectiveness of the partner program upfront and establish the process to measure     over the lifetime of the program. Also identify the lead/lag indicators within the program (over the timeline) (as well as the mechanism for change) that would allow     us to change the strategy or program benefits if targets are not met in order to meet our business goals.
     - This would also include investigating the establishment of Nokia Partner Advisory council and eventually completing the program details and guidelines,   announcing it and being responsible for this council

5. **Regional channel events:** Drive project management of events including content, materials creation and metrics. Insure alignment with regional sales goals and coordination with regional marketing teams.
**Who are my suggested partners, e.g. Ruth, Nadine, CS, Kathy Tian?)** NOTED IN DETAIL ABOVE THAT SAYS 'REGIONAL MARKETING TEAMS'

Let me know if you have any questions or require any clarification!

Rgds,
mm

2

## Lennon Deborah (Nokia-ES/NewYork)

**From:** Mak Yoikwong (Nokia-ES/Singapore)
**Sent:** Sunday, February 26, 2006 6:18 PM
**To:** Lennon Deborah (Nokia-ES/NewYork)
**Subject:** FW: New Appointments in ES Global Marketing

Hi Deborah,
Welcome on-board Nokia again. I look forward to your channel marketing  leadership and exciting time ahead.

Cheers,
YK

---

**From:** es-internal-releases-bounces@nokia.com [mailto:es-internal-releases-bounces@nokia.com] **On Behalf Of** ES.Communications@nokia.com
**Sent:** Saturday, February 25, 2006 4:56 AM
**To:** ES-Internal-Releases@nokia.com
**Subject:** New Appointments in ES Global Marketing

Dear ES Colleagues,

I am pleased to announce two new additions to the ES Marketing team.

**Deborah Lennon** has joined my staff and will direct our Channel Marketing efforts. Deborah will be responsible for defining and implementing an updated and expanded Channel Marketing support program. She will work most closely with John Mason in this effort and will call on many ES Sales, Marketing and BU teammates to contribute.

Deborah is a veteran of channel marketing, having held similar leadership roles at Sun, 3Com, Shoreline Communications and Wyse in both the U.S. and international-focused assignments. She is currently working in our Mountain View, California office but will relocate to New York mid-year.

**Kriss Channe** has also joined my staff and will head up our APAC Marketing. Kriss will work closely with Mathia Nalappan in this role. Kriss brings a wealth of experience in marketing leadership having held similar positions at ICL, 3Com, Novell, Netscape and Symbol Technologies. She was born in China, educated in England, and now resides in Singapore. Please note that while we continue our search for a marketing leader for Greater China, Kriss will have the role of Acting Director of Greater China.

I'd like to thank **Bonnie Datta** for her efforts as the Acting Director of APAC during this search, in addition to filling her own operational assignments. Bonnie will now become part of Kriss's APAC Marketing team. Thank You Bonnie.

Barry Issberner
Global Marketing
Enterprise Solutions

2/27/2006

**THE LENOX CONDOMINIUM LLC**
c/o K and R Realty Management, Inc.
37 West 65th Street
New York, New York 10022

**NOTICE OF DEFAULT**

February 9, 2007

US MAIL & CERTIFIED MAIL
RETURN RECEIPT REQUESTED
Ms. Deborah Lennon
81 South 16th Street
San Jose, California 95112

Re:    The Lenox Condominium
       Unit:    7J
       Premises: 380 Lenox Avenue, New York, New York

Dear Ms. Lennon:

PLEASE TAKE NOTICE that you have failed to close title pursuant to the terms of the Offering Plan for The Lenox Condominium, dated August 25, 2005, as amended, the Purchase Agreement for the referenced Unit executed between The Lenox Condominium LLC, as Seller and you as Purchaser, and the Notice of Closing dated December 20, 2006. Therefore, pursuant to paragraph 7 of said Purchase Agreement, such failure constitutes a default by you under that Agreement. That default must be cured within thirty (30) days of giving this Notice. Time is of the essence for you to cure such default within the abovementioned thirty (30) day period. If such default is not cured within such thirty (30) day period, the Seller may (but shall not be obligated to) to cancel the Purchase Agreement, in which event the Escrow Agent may be authorized to release the Purchase Agreement down payment to Seller as liquidated damages. Thereupon, the Purchase Agreement will be terminated and the Seller may sell the Unit to any third party, and shall be under no obligation to account to you for any part of the proceeds of such sale.

We remind you that due to your failure to close by February 9, 2007, you may be required to pay or reimburse Sponsor for all common charges and all real estate taxes attributable to the period between February 9, 2007 and the actual date of your closing. In addition, you may also be obligated to pay to Sponsor, at closing, interest on the unpaid balance of your purchase price, accrued from February 24, 2007, at the rate of twelve (12%) percent per annum.

Very truly yours,

THE LENOX CONDOMINIUM LLC

By: 400 Equities LLC, Managing Member

By: Robert Ezrapour, Manager

cc:  Bernd H. Allen, Esq.

G:\7259\001\7J (Lennon)\Notice of Default.doc

**ROBERT CATENACCIO, M.D.**
*Child Psychiatry / Adult Psychiatry*
2005 Palmer Avenue
Larchmont, NY 10538
Tel: (914) 834-2214

11/7/06

TO Fred Bullock:

Regarding Deborah Lennon —
Ms Lennon has consulted me for stress-related anxiety. I am recommending that she remain out of work for the next 1-2 weeks.

R Catenaccio M.D.

PLEASE
DO NOT
STAPLE
IN THIS
AREA

**HEALTH INSURANCE CLAIM FORM**

PICA

| MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|

909997880

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
LENNON, DEBORAH, A.

3. PATIENT'S BIRTH DATE  MM 07 DD 29 YY 55   SEX  M ☐  F ☒

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SAME AS PATIENT

5. PATIENT'S ADDRESS (No., Street)
25 MARTINE AVE, #601

6. PATIENT RELATIONSHIP TO INSURED
Self ☒  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY  WHITE PLAINS   STATE NY

8. PATIENT STATUS
Single ☒  Married ☐  Other ☐

CITY   STATE

ZIP CODE 10606   TELEPHONE (Include Area Code) (914) 579-8725

Employed ☒  Full-Time Student ☐  Part-Time Student ☐

ZIP CODE   TELEPHONE (INCLUDE AREA CODE) (   )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
213813

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
☐ YES  ☒ NO

a. INSURED'S DATE OF BIRTH  MM DD YY   SEX  M ☐  F ☐

b. OTHER INSURED'S DATE OF BIRTH  MM DD YY   SEX  M ☐  F ☐

b. AUTO ACCIDENT?   PLACE (State)
☐ YES  ☒ NO

b. EMPLOYER'S NAME OR SCHOOL NAME
NOKIA

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
☐ YES  ☒ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
UHC CHOICE PLUS POD

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
☐ YES  ☒ NO   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Deborah A. Len   DATE  11/08/06

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Deborah A. Len

14. DATE OF CURRENT  MM 09 DD 01 YY 06  ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS  GIVE FIRST DATE  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  MM DD YY   TO  MM DD YY

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM  MM DD YY   TO  MM DD YY

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?  ☐ YES  ☐ NO   $CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 296 33

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A DATE(S) OF SERVICE From MM DD YY  To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 7 06 | 11 | 7 | 90807 | | 1 | 250 00 | 0 | | | | |

25. FEDERAL TAX I.D. NUMBER  SSN ☐ EIN ☐
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

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  ☒ YES  ☐ NO

28. TOTAL CHARGE  $ 250 00

29. AMOUNT PAID  $ 250.00

30. BALANCE DUE  $ 0 00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED  Robert Catenaccio   DATE 11/7/06

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
Robert Catenaccio, M.D.
2005 Palmer Ave. Suite 200
Larchmont, NY 10538
tel: 914-

APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88

PLEASE PRINT OR TYPE

FORM HCFA-1500 (12-90)