UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH LENNON,<br><br>                Plaintiff,<br><br>- against -<br><br>NOKIA, INC.,<br><br>                Defendant. | Civil Action No. 07 CV 343 (KMK) (LMS)<br><br>**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS** |

Defendant Nokia, Inc., by and through its counsel of record, respectfully submit the following statement of material facts as to which there is no genuine dispute according to Rule 56.1(a) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York.[1]

1.    In Fall 2005, Plaintiff, Deborah Lennon was laid off by her employer, Sun Microsystems. (Deposition of Plaintiff Deborah Lennon ("Pl. Dep."),[2] pp. 38, 69, 83-84).

2.    On October 26, 2005, a recruiter forwarded Ms. Lennon a job advertisement for a Channel Marketing Director position at Nokia, Inc. (Pl. Dep., pp. 77, 82-83, Exh. C).

3.    The position was to help develop and craft channel marketing programs for Nokia's Enterprise Solutions Division. (Pl. Dep., pp. 82-83, Exh. C; Amended Complaint ("Am. Compl.),[3] Exh. C).

4.    The advertisement stated that "the qualified candidate will help develop and craft the channel marketing programs and materials related to the recruitment and development of channel partners including IT Distributors, VAR's, ISV's and SI's. Operator B2B sales and

---

[1] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the following facts are undisputed solely for purposes of Defendant's Motion for Summary Judgment.
[2] The excerpts from the transcript of Plaintiff's deposition are attached to the Declaration of Orit Goldring in Support of Defendant's Motion for Summary Judgment ("Goldring Decl.") as Exhibit A.
[3] The Amended Complaint is attached to the Goldring Decl. as Exhibit B.

marketing operations are a secondary but important target as well." (Pl. Dep., pp. 82-83, Exh. C).

    5.    Ms. Lennon was living in California and the position was in New York. (Pl. Dep., pp. 326-27).

    6.    Ms. Lennon found the "start-up" aspect of the position exciting. (Pl. Dep., p. 84).

    7.    In response to receiving the job advertisement, Ms. Lennon contacted the recruiter who sent her the job advertisement. (Pl. Dep., pp. 77, 85).

    8.    Ms. Lennon applied for the position. (Pl. Dep. 91, Exh. D).

    9.    No one from Nokia solicited Ms. Lennon for the position. (Pl. Dep., p. 326).

    10.    Ms. Lennon knew that by voluntarily choosing to apply for the position she was expressing to Nokia that she was willing to move to New York. (Pl. Dep., p. 327).

    11.    Ms. Lennon had family living on the East Coast. (Pl. Dep., p. 13).

    12.    Ms. Lennon had a telephone interview with Barry Issberner, Vice President of Global Marketing. (Pl. Dep., pp. 92-93).

    13.    Mr. Issberner told Ms. Lennon that they were looking to put a new channel program in place and that it was for a start-up division of Nokia that would require building, designing and implementing. (Pl. Dep., pp. 93-94).

    14.    During the interview process, and from the job posting, Ms. Lennon was aware that the position would encompass both sales and marketing. (Pl. Dep., pp. 82-83, 105-06, Exh. C).

    15.    No promises were made to Ms. Lennon during the interview process:

> Q.    What were the promises that were made to you during these interviews that form the basis of your complaint? I want to know each promise.
>
> A.    I'm not sure I would use the word promise. These

>     discussions, these interviews, were about the job that I was expected to perform. I had every reason to believe that this was the job that I was going to be asked to do, and that I would be given the resources to do it. We didn't discuss the weather and we didn't discuss my future role at Nokia, perhaps, if I moved up to another level or something. We discussed what the job was and what the requirements were and the deliverables would be.
>
>     Q.    But no one promised you anything; did they?
>
>     A.    That's not the correct word, no. We discussed the job.
>
>     Q.    Were you giving – given assurances about the job?
>
>     A.    Actually, yes, I was, from Barry. I was told that they had actually struggled to get the headcount for this job; that it was really critical. That the timing was, you know, way off because they had already made a commitment to partners to announce a program in March, and remember, I'm talking to Barry in December. These programs actually would normally take about a year to design one and a year to implement one. Probably a good rule of thumb. So we talked a lot about how he had experience in designing and building programs. They knew what it would take. He was really concerned about the timing, but he had managed to get the resources, would get the resources I needed and needed to get this job done like yesterday.
>
>     Q.    Any other assurances that you were given; that you were relying on as a basis for your complaint?
>
>     A.    Just that we had thoroughly discussed the job and it was not what that job *evolved* to.

(Pl. Dep., pp. 107-08) (emphasis added).

16.    Ms. Lennon admits that no express promises were made to her prior to her acceptance of the job. (Pl. Dep., pp. 302-03).

17.    Ms. Lennon understood that her job responsibilities would include what was outlined in the job posting, the thank you notes she sent the people who interviewed her and her action plan. (Pl. Dep., p. 82-83, 111, Exh. C; Am. Compl. Exhs. C and D).

18.    Ms. Lennon received an offer letter, dated January 5, 2006, stating:

3

> You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the company. Likewise, the Company may terminate your employment at any time with or without cause or advance notice. This at-will employment relationship cannot be changed except in writing signed by the Vice President of Human Resources. This letter supersedes any other agreements or promises made to you by anyone, whether oral or written.

(Pl. Dep., pp. 113-14, Exh. E).

19. The offer letter also states: "You are eligible to receive relocation assistance. Please refer to the attached summary for information. Relocated employees are required to sign a Relocation Agreement which outlines repayment responsibility should termination occur within one year of relocating. Please sign and return the Relocation Agreement with your signed offer letter." (Pl. Dep., p. 114, Exh. E).

20. Ms. Lennon signed the offer letter, accepting the terms of employment provided therein. (Pl. Dep., pp. 114-15, Exh. E).

21. On January 30, 2006, Ms. Lennon began working for Nokia in California. (Pl. Dep., pp. 132-33).

22. At the time she was hired by Nokia, Ms. Lennon was not employed elsewhere. (Pl. Dep., p. 325).

23. Ms. Lennon also filled out an online application titled "Application For At-Will Employment." (Pl. Dep., pp. 120-21, Exh. F).

24. The notifications and agreement section of the application states:

> I hereby understand and agree that if employed by Nokia I will be an employee at will of one of the Nokia Group affiliate companies ("Nokia"). As an employee at will: 1) Nokia or I may terminate the employment relationship at any time, with or without cause; and 2) there is no agreement, express or implied, between Nokia and me for any specific period of employment or for continuing or long term employment. I understand and agree that if hired, my at will employment with Nokia may only be modified by a separate

4

>   written document signed by me and the President of Nokia. I have
>   read and understand the above agreement.

(Pl. Dep., p. 120, Exh. F).

25. Ms. Lennon submitted the application. (Pl. Dep., p. 121).

26. Ms. Lennon received a relocation agreement for Nokia. (Pl. Dep., p. 122).

27. The relocation agreement states: "I further acknowledge should I . . . voluntarily terminate my employment, with NOKIA prior to twelve (12) months from the date of relocation, it is agreed I will reimburse NOKIA for any and all expenses, including tax liability paid to me or on my behalf, related to my relocation per the following table . . . .0-6 months 100%" (Pl. Dep., p. 122; Exh. G).

28. On January 7, 2006, Ms. Lennon signed the relocation agreement acknowledging that she understood, agreed and accepted its terms. (Pl. Dep., p. 122; Exh. G).

29. Ms. Lennon received a copy of the NOKIA relocation policy, read it, and acknowledged its terms and conditions. (Pl. Dep., pp. 122-24, Exh. G).

30. The relocation policy states *inter alia*: "To be eligible for relocation assistance, the following criteria must be met . . . You must work full-time at the new location for thirty-nine (39) weeks within the first year of transfer." (Pl. Dep., p. 124; Exh. H, (p. 5)).

31. Ms. Lennon moved to New York on June 3, 2006. (Pl. Dep., p. 125).

32. Nokia paid Ms. Lennon monies in connection with her relocation expenses. (Pl Dep., pp. 332-33).

33. Ms. Lennon's employment with Nokia terminated on November 10, 2006. (Pl. Dep., p. 125).

34. Because Ms. Lennon was not working at the new location full-time for thirty-nine weeks, she was not eligible for relocation assistance. (Pl. Dep., p. 125).

35. Nokia's Employee Handbook states:

> The provisions of this handbook are not intended to create contractual obligations of any kind. Nokia is an At-Will employer and the employment relationship can be terminated with or without cause at any time, at the option of either the employer or Nokia. No agreement to the contrary may be made unless it is specific and expressly waives the At-Will status, in writing and is signed by the employee and the Vice-President of Human Resources, Americas Region.

(Pl. Dep., p. 130; Exh. I, (p. 3)).

36. The Employee Handbook also states:

> It is the express policy of the Company that the employment relationship between the employee and Nokia is At-Will. This means that the employment relationship may be terminated, with or without cause, at any time by the employee or the Company. No agreement to the contrary may be made unless it is specific and expressly waives the At-Will status, in writing and is signed by the employee and the Vice-President of Human Resources, Americas Region.

(Pl. Dep., p. 130; Exh. I, (p. 4)).

37. The Employee Handbook further provides that: "Unreported or unexcused absences of three or more days will be considered a voluntary termination of employment." (Pl. Dep., p. 130; Exh. I, (p. 7, bullet point 8)).

38. Moreover, the Employee Handbook states: "Unreported absences of 3 consecutive days will be considered a voluntary termination." (Pl. Dep., p. 130; Exh. I, (p. 9)).

39. Ms. Lennon received Nokia's Employee Handbook and understood it was her responsibility to read and abide by it. (Pl. Dep., pp. 127-29; Exh. J).

40. The Employee Handbook Acknowledgement states:

> This handbook is not an employment contract, and both the employee and the company understand that employment may be terminated by either at any time, with or without cause, without notice. No agreement to the contrary may be made unless it is specific and expressly waives the at-will status, in writing and is

6

signed by the employee and an officer of the company.
(Pl. Dep., p. 127; Exh. J).

41. During her first month of employment at Nokia, the job lived up to Ms. Lennon's expectations. (Pl. Dep., p. 135).

42. Barry Issberner was Ms. Lennon's manager from the start of her employment until he left in July 2006. (Pl. Dep., p. 133).

43. Thereafter, Megan Matthews became Ms. Lennon's acting manager until the end of September beginning of October 2006, when Fred Bullock assumed that position. (Pl. Dep., pp. 133-34).

44. After July 11, 2006, Ms. Lennon felt that her job duties started to shift or change. (Pl. Dep., p. 137).

45. On July 11, 2006, David Petts, Senior Vice President of Enterprise Solutions Sales and Marketing, Ms. Lennon's boss, met with Ms. Lennon, John Mason, Vice President of Channels, and Steve Jones. (Pl. Dep., pp. 143-45; Am. Compl. ¶¶ 11, 32).

46. Ms. Lennon presented the status of the Channel Program and Mr. Petts expressed that the group was on the wrong track. (Am. Compl. ¶ 32).

47. Mr. Petts indicated that the program designed was not at all what he had in mind. (Pl. Dep., p. 144).

48. Mr. Petts wanted to implement his own philosophy and design to the program. (Pl. Dep., p. 144-45).

49. Mr. Petts "had knowledge of channel programs and he put forth in that meeting his philosophy and what he expected in a program. His rationale was quite sound." (Pl. Dep., pp. 144-45, 147-48).

50. Mr. Petts absolutely had a right to make changes. (Pl. Dep., p. 145).

7

51. Ms. Lennon believes that events of the past became actionable on July 11, 2006 after her meeting with Mr. Petts. (Pl. Dep., pp. 142-44).

52. On July 12, 2006, Ms. Lennon, John Mason and Steven Jones met to put together a new project plan. (Pl. Dep., p. 147).

53. From July 17 to July 24, 2006, Ms. Lennon was on vacation. (Pl. Dep., pp. 149-50).

54. During the week she was out of the office, meetings were held to discuss the program. (Pl. Dep., p. 150).

55. Ms. Lennon was invited to those meetings but did not attend because of her vacation. (Pl. Dep., pp. 150-51).

56. When Ms. Lennon returned to work, there was a project plan put in place that replaced the one she had put together with John Mason and Steven Jones. (Pl. Dep., p. 151).

57. The changes included allocating to Ms. Lennon the marketing communications deliverables and activities related to the program. (Pl. Dep., p. 152).

58. Marketing communications was a part of Ms. Lennon's job. (Pl. Dep., p. 163).

59. Another change was that two independent contractors would be hired and they, in turn, would take direction from Ms. Lennon. (Pl. Dep., pp. 152-53).

60. Ms. Lennon met with Megan Matthews on July 25 and July 31, 2006. (Pl. Dep., p. 162).

61. As a result of the meetings, Ms. Matthews sent Ms. Lennon an email redefining the focus of Ms. Lennon's job. (Pl. Dep., p. 164; Exh. L).

62. Ms. Lennon replied to the email "This looks good . . ." and asked some questions to which Ms. Matthews replied. (Pl. Dep., pp. 164-65 Exh. L).

63. Thereafter, Ms. Lennon felt that her input at meetings was glossed over, she became frustrated. (Pl. Dep., pp. 171-73).

64. On November 7, 2006, Ms. Lennon sent an email to Fred Bullock, telling him that she was ill and would not attend the team meeting that day and that she would keep him posted. (Pl. Dep., pp. 188-89, Exh. N).

65. Ms. Lennon did not go into work on November 7, 2008. (Pl. Dep., pp. 189-90).

66. Ms. Lennon went to the doctor who recommended that she stay out for a couple of weeks. (Pl. Dep., p. 190).

67. On November 8, 2006, Ms. Lennon did not go into work and did not notify anyone at Nokia that she would be out. (Pl. Dep., pp. 190-91).

68. On November 9, 2006, Ms. Lennon did not go into work and did not notify anyone at Nokia that she would be out. (Pl. Dep., p. 191).

69. On November 10, 2006, Ms. Lennon did not go into work and did not notify anyone at Nokia that she would be out. (Pl. Dep., p. 191).

70. From November 7, to November 10, Ms. Lennon was out and did not notify anyone at Nokia that she would be out. (Pl. Dep., pp. 191-92).

71. Ms. Lennon received a termination letter from Nokia dated November 10, 2006, stating:

> [Y]ou have not reported to work or provided any information regarding your status and intentions since November 7, 2008, lead[ing] us to conclude that you are no longer interested in continuing your employment with Nokia and you will be separated from your employment effective today, November 10, 2006. . . . Please contact me . . . to make arrangements for repayment of relocation expenses as required by your agreement with the company.

(Pl. Dep., p. 194; Exh. O).

72. Ms. Lennon testified that she voluntarily left Nokia and that she did so intentionally:

> Q. Okay. So it's not your belief that you left Nokia voluntarily?
>
> A. I just said it is my belief that I left Nokia voluntarily. The circumstances were not circumstances I wanted.
>
> Q. You may not have been happy about it, but you agree - -
>
> A. I initiated my departure, initiated. How's that?

(Pl. Dep., pp. 246-47).

73. Ms. Lennon further testified:

> Q. For these, the entity or the companies you have interviewed with or applied to, what have you told them about termination of your Nokia employment?
>
> A. I told them I left Nokia because the job – because the VP of marketing that hired me left the company and the job evolved into a marketing communications job, which is not what I – that's not my core expertise not is it the job that I applied for or signed up to do.
>
> Q. Do you feel tat what you've told these employers is accurate?
>
> A. Yes, I do.

(Pl. Dep., pp. 78-79, 93).

74. Ms. Lennon does not claim that Nokia acted unlawfully in terminating her employment. (Pl. Dep., pp. 309-10).

75. Ms. Lennon has no knowledge that the people who interviewed her or gave her the job posting had the intent to change her job:

> Q. At the time that you were interviewing and you drafted your action plan and you had your job description and your interviews, where you received these assurances, do you have any

10

>   knowledge that the people who interviewed you or gave you the job description had the intent to change the job?
>
>   A.   My assumption –
>
>   Q.   No. I'm asking if you have personal knowledge.
>
>   A.   That they were going to change this job on me?
>
>   Q.   Yeah, that they intended to change the job?
>
>   A.   No.

(Pl. Dep., p. 169).

76.   It does not make sense to Ms. Lennon that Nokia would hire her, spend money to relocate her and then turn around and frustrate her job:

>   Q.   I guess what I'm trying to figure out is why – you're claiming that the company hired you, was going to relocate you, spend all this money to do that, and then they turned around and frustrated your job?
>
>   A.   They did.
>
>   Q.   It doesn't make sense; does it? Why would they do that?
>
>   A.   It doesn't, but that's what happened.
>
>   Q.   But why would they do that?
>
>   A.   I can't tell you why they did that, it happened.

(Pl. Dep., pp. 160-61).

11

Date:   November 14, 2008
           New York, New York

_____
Craig R. Benson (CB 9531)
Deke W. Bond (DB 0349)
Orit Goldring (OG 1023)
LITTLER MENDELSON
  A Professional Corporation
885 Third Avenue, 16th Floor
New York, NY  10022.4834
212.583.9600

Attorneys for Defendant Nokia, Inc.