**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**DEBORAH LENNON,**

                              **Plaintiff,**                    **07 Civ. 343 (KMK)(LMS)**

              *- against -*

                                                              **DECISION AND ORDER**
**NOKIA, INC.,**

                              **Defendant.**

**LISA MARGARET SMITH, U.S.M.J.**

        Deborah Lennon ("Plaintiff") brings this action against Nokia, Inc. ("Defendant") for

fraudulent inducement to enter into a contract of employment.[1]  Defendant counterclaims for

breach of contract based on Plaintiff's failure to reimburse Defendant for expenses paid pursuant

to their relocation agreement.  Docket # 10.  Defendant now moves for summary judgment on

Plaintiff's claim and on its counterclaim, and Plaintiff cross-moves for summary judgment on

Defendant's counterclaim.  See Docket #'s 29-32, 40-54, 57-58.  The parties have consented to

my jurisdiction for purposes of deciding the motions.  Docket # 28.  For the reasons that follow,

Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion for summary

judgment is denied.

---

        [1] Plaintiff commenced the action in state court, but it was removed to federal court by
Defendant.  Docket # 1 (Notice of Removal).  Plaintiff subsequently filed an Amended
Complaint on May 1, 2007.  Docket # 9.

## BACKGROUND[2]

In the fall of 2005, Plaintiff was laid off by her then-employer, Sun Microsystems. Defendant's S.J. 56.1 Statement ¶ 1.  On October 26, 2005, a recruiter sent Plaintiff an advertisement for a Channel Marketing Director position with Defendant.  Id. ¶ 2; see Lennon Aff. (Docket # 45) Ex. 1.  At the time, Plaintiff lived in California, while the advertised position was located in New York.  Defendant's S.J. 56.1 Statement ¶ 5.  Plaintiff contacted the recruiter and applied for the position.  Id. ¶¶ 7-8.  Plaintiff had a telephone interview with Barry Issberner, Vice President of Global Marketing.  Id. ¶ 12.  Issberner requested that Plaintiff draft a channel marketing action plan, setting forth the steps she would take to develop and implement channel programs.  See Egan Aff. (Docket # 44) Ex. A (Lennon Depo.) at 95.  Thereafter, Plaintiff interviewed with other of Defendant's employees.  Id. at 96-97, 99, 101-02.  It was Plaintiff's understanding that her job responsibilities would include what was outlined in the job posting, in the "thank you" notes that she sent to her interviewers, and in her channel marketing action plan. Defendant's S.J. 56.1 Statement ¶ 17.

Plaintiff received an offer letter from Defendant dated January 5, 2006, which she signed on January 7, 2006.  See Lennon Aff. Ex. 5.  The offer letter states, "You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying

---

[2] The facts set forth in this section are taken from: (1) the Amended Complaint (Docket # 9); (2) the Rule 56.1 Statement submitted by Defendant in support of its motion (Docket # 32 ) ("Defendant's S.J. 56.1 Statement"); (3) the Rule 56.1 Statement submitted by Plaintiff in opposition to Defendant's motion (Docket # 46) ("Plaintiff's Opp. 56.1 Statement"); (4) the Rule 56.1 Statement submitted by Plaintiff in support of her cross-motion (Docket # 49) ("Plaintiff's S.J. 56.1 Statement"); (5) the Rule 56.1 Statement submitted by Defendant in opposition to Plaintiff's cross-motion (Docket # 54) ("Defendant's Opp. 56.1 Statement"); and (6) the evidence submitted by the parties in support of their motions.

the company.  Likewise, the Company may terminate your employment at any time with or without cause or advance notice.  This at-will employment relationship cannot be changed except in writing signed by the Vice President of Human Resources."  Id.  Plaintiff claims that she did not understand that provision of the letter at the time she signed it.  Goldring Decl. Ex. A (Lennon Depo.) at 115.[3]  Plaintiff's online application form for the job also stated that she was being offered at-will employment, Goldring Decl. Ex. A (Lennon Depo.) Ex. F, as did the Handbook that she received.  Id. Ex. I at 3, 4.[4]  Plaintiff also received a relocation agreement from Defendant, which she signed on January 7, 2006.  See Lennon Aff. Ex. 6; see also Defendant's S.J. 56.1 Statement ¶ 26; Plaintiff's Opp. 56.1 Statement ¶ 26.

Plaintiff began working for Defendant on January 30, 2006, from California.  Defendant's S.J. 56.1 Statement ¶ 21; Plaintiff's Opp. 56.1 Statement ¶ 21.  At the time that Plaintiff was hired by Defendant, she did not have a job, although she ceased negotiations for another job with a company in California as a result of Defendant's offer.  Defendant's S.J. 56.1 Statement ¶ 22; Plaintiff's Opp. 56.1 Statement ¶ 22.  Plaintiff moved to New York in June, 2006.  Defendant's S.J. 56.1 Statement ¶ 31; Plaintiff's Opp. 56.1 Statement ¶ 31.  The parties dispute whether the job lived up to Plaintiff's expectations.  Compare Defendant's S.J. 56.1 Statement ¶ 41 with Plaintiff's Opp. 56.1 Statement ¶ 41.  On July 11, 2006, Plaintiff attended a meeting with her boss, David Petts, Senior Vice President of Enterprise Solutions Sales and Marketing, John

---

[3]Plaintiff's Rule 56.1 Statement states that Plaintiff testified that it was her understanding that she could not be terminated without cause, Plaintiff's Opp. 56.1 Statement ¶ 18, but she failed to submit those pages of her deposition to the Court.

[4]Plaintiff asserts that these provisions concerning at-will employment are "irrelevant" since her claim is for fraud in the inducement.  See Plaintiff's Opp. 56.1 Statement ¶¶ 24, 35, 36.

Mason, Vice President of Channels, and Steve Jones.  Defendant's S.J. 56.1 Statement ¶ 45.  At

the meeting, Plaintiff made a presentation concerning the status of the Channel Program, and Mr.

Petts indicated that the program that had been designed was not what he wanted.  Am. Compl. ¶

32; Defendant's S.J. 56.1 Statement ¶ 47.[5]

According to Defendant, following the July 11th meeting, Plaintiff met with John Mason

and Steve Jones on July 12, 2006, to devise a new project plan.  Defendant's S.J. 56.1 Statement

¶ 52; see Goldring Decl. (Docket # 31) Ex. A (Lennon Depo.) at 147 ([At the July 12th meeting,

they discussed] "[h]ow David Petts' revised channel program was a major, major change from

what we had been designing and what we had been working on for the last six months.  And that

the management of that program would be magnitudes more complex.  And then we put together

a new project plan with the right people in the contributing and lead positions on that.").  Plaintiff

went on vacation on July 17, 2006, and returned to work on July 24, 2006.  Defendant's S.J. 56.1

Statement ¶ 53.  During that time, there were meetings held to discuss all aspects of the program.

Id. ¶ 54.  According to Plaintiff, when she returned from vacation, there was a new project plan

that had taken the place of the one she had devised with John Mason and Steve Jones, which

---

[5]Plaintiff characterizes this meeting differently in her Amended Complaint and her
subsequent affidavit submitted in opposition to Defendant's motion.  Compare Am. Compl. ¶ 32
("When Plaintiff made her presentation, Mr. Petts quickly indicated the group was on the wrong
track and subsequently implemented his own philosophy and design with Mr. Mason's approval
displaying another instance of Defendant frustrating Plaintiff's employment.") with Lennon Aff. ¶
25 ("I described only the proposed channel accreditation/certification program that was based on
Mason's directives with minimal consideration of my input and often over my objections.  Mason
was reluctant to make any differentiation in the requirements and rewards to prospective partners
for fear of offending those channel partners who were already distributing Nokia's security
appliance products and mobile phones.  Petts disagreed and required the channel
accreditation/certification program to be modified significantly.  My views of what was
appropriate were much closer to Petts' than to Mason's.  I had to convince Mason that Petts'
changes were substantial and required an aggressive timeline for completion.").

included two new contractors and other employees.  Plaintiff's Opp. 56.1 Statement ¶ 56.  Under

the new plan, Plaintiff became responsible for marketing communications, id. ¶ 57,[6] while two

contractors were hired to assume responsibilities that had been part of Plaintiff's job description –

"Program definition, guidelines and naming" and "Program localization and implementation."

Id.; Lennon Aff. Ex. 8.  While Plaintiff was told that these two contractors were supposed to

report to her, they neither reported to her nor took direction from her; rather, they took direction

from John Mason.  Plaintiff's Opp. 56.1 Statement ¶ 57.

At the beginning of August, 2006, Plaintiff exchanged e-mails with Megan Matthews,

who had replaced Barry Issberner as Plaintiff's manager.  See Goldring Decl. Ex. A (Lennon

Depo.) at 164-65 & Depo. Ex. L.  As Matthews explained to Plaintiff, "this is redefining your

focus areas as part of your job." Id. Ex. L.  According to Plaintiff, she did not know why this

refocusing of her job took place, but it occurred while she was away on vacation in July: "When I

left on vacation, we had a project plan that Steve, John, and I had agreed to, and I was the lead

and possibly a contributor in the program definition and the program implementation." Id. at

165.[7]  Plaintiff claims that throughout August, 2006, her duties continued to change; she was no

longer privy to a lot of meetings, and when she tried to participate in core team meetings, she was

discredited or not listened to.  Id. at 171-73.  Thereafter, she continued to be marginalized in her

job.  Id. at 188.

---

[6]However, the chart created for the new program states, under the heading "Core Team Tracks," that Plaintiff was the lead on both "Channel Program Evolution" and "Marketing Comm[unication]s."  Lennon Aff. Ex. 8.

[7]Indeed, in the "Core Team Tracks" chart, Plaintiff is listed as a contributor in "Program definition, guidelines and naming."  Lennon Aff. Ex. 8.

Plaintiff states in her Rule 56.1 Statement in response to Defendant's motion, "Nokia never allowed her to perform the job for which she moved," and "Nokia did not allow her to perform a Global Channel Marketing Director role.  Nokia did not tell Lennon that they hired [John] Mason to perform the job prior to hiring Lennon.  Nokia misrepresented to Lennon that she would have the opportunity to perform the Global Channel Marketing Director role." Plaintiff's Opp. 56.1 Statement ¶ 35.  Plaintiff further contends, "That Mason's job encompassed virtually all of the responsibilities included in Ms. Lennon's job description is demonstrated by a comparison of Ms. Lennon's job description and the job requisition which David Petts, the Senior Vice President of Marketing and Sales for Enterprise Solutions and the person to whom both Mason and Issberner reported, identified as John Mason's [j]ob description."  Id. ¶ 96.  In sum, according to Plaintiff, she "was frustrated from the beginning of her employment with Nokia because she was given a different job than the one she was offered and accepted."  Id. ¶ 63.

With respect to Defendant's counterclaim, the relocation agreement signed by Plaintiff on January 7, 2006, states,

> I further acknowledge should I fail for any reason under my control to begin the assignment on the designated date, be discharged for disciplinary action to include but not limited to unlawful or criminal conduct, falsification of records, physical violence, destruction of company property, improper discrimination, harassment of other employees, including sexual harassment or voluntarily terminate my employment, with NOKIA prior to twelve (12) months from the date of relocation, it is agreed I will reimburse NOKIA for any and all expenses . . . per the following table . . .

Goldring Decl. Ex. A (Lennon Depo.) Ex. G.  The Nokia Handbook states that "[u]nreported absences of 3 consecutive days will be considered a voluntary termination."  Lennon Depo. Ex. I at 9.  Plaintiff also initialed the relocation agreement next to the statement, "I have read and

acknowledge the terms and conditions set forth in the NOKIA Relocation Policy."  Lennon Depo.

Ex. G.  The Relocation Policy states that in order to be eligible for relocation assistance, an

employee must, among other things, "work full-time at the new location for thirty-nine (39)

weeks within the first year of transfer."  Lennon Depo. Ex. H at 5.

In March, 2006, Plaintiff made a deposit on a home in New York, and she relocated to

New York in June, 2006.  Plaintiff's S.J. 56.1 Statement ¶ 21.  On November 7, 2006, Plaintiff

sent an e-mail to Fred Bullock, her then-manager, which stated that she would be out ill, was

"trying to get in to see my doctor this morning/afternoon," and would keep him posted.  Lennon

Aff. Ex. 10.  Bullock responded, "OK, thanks."  Id.  Plaintiff neither went to work nor contacted

anyone at work on either November 8, 9, or 10.  See Goldring Decl. Ex. A (Lennon Depo.) at

190-91.  On November 10, 2006, Neal Wagner, HR Director – Northeast Area, sent a letter to

Plaintiff which stated as follows,

> It has become clear that it is not feasible to continue your employment
> with Nokia.  As we have discussed, your performance and behavior have
> been unsatisfactory despite our efforts to provide you with feedback and
> direction.  You have repeatedly expressed dissatisfaction with and a lack
> of interest in continuing, your role with the company.  These ongoing
> issues, coupled with the fact that you have not reported to work or
> provided any information regarding your status and intentions since
> November 7, 2006, lead us to conclude that you are no longer interested in
> continuing your employment with Nokia, and you will be separated from
> employment effective today . . . .  Please contact me . . . to . . . make
> arrangements for repayment of relocation expenses as required by your
> agreement with the company.

Lennon Aff. Ex. 11.  Plaintiff commenced her lawsuit soon thereafter.  See Docket # 1 (Notice of

Removal).

7

## DISCUSSION

### I.    Standard for Summary Judgment

Under Rule 56, summary judgment should be "rendered if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 320-23 (1986).

> Upon any motion for summary judgment pursuant to Rule 56 of the
> Federal Rules of Civil Procedure, there shall be annexed to the
> notice of motion a separate, short and concise statement, in
> numbered paragraphs, of the material facts as to which the moving
> party contends there is no genuine issue to be tried.  Failure to
> submit such a statement may constitute grounds for denial of the
> motion.

 Local Civ. R. 56.1(a).  A dispute about a material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  A trial judge may, therefore, grant summary judgment only if there is

no genuine issue as to any material fact and if the moving party is entitled to judgment as a

matter of law.  See Anderson, 477 U.S. at 250.  The inquiry performed is the threshold inquiry of

determining whether there are any genuine factual issues that properly can be resolved only by a

finder of fact.  Id.

Where a properly supported motion for summary judgment is made, the adverse

party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56.  Under Local Rule 56.1(b), the papers opposing a motion for summary judgment shall include

a correspondingly numbered paragraph responding to each numbered paragraph in the statement

of the moving party, and if necessary, additional paragraphs containing a separate, short, and

8

concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.  Local Civ. R. 56.1(b).  Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.'"  Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting Celotex, 477 U.S. at 323) (alteration in original).  Indeed, if the party opposing summary judgment does not respond to the motion, "summary judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e). However, even where the nonmoving party fails to respond to a motion for summary judgment, the court

> may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.  If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented*.

D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)) (emphasis in original).

Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); Farias v. Instructional Sys., Inc., 259 F.3d 91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see also Anderson, 477 U.S. at 261 n.2.  Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. v. Siemans Med. Sys. Inc., 879 F.2d 1005, 1011 (2d Cir. 1989)).

II.     **Motion for Summary Judgment on Plaintiff's Fraudulent Inducement Claim**

Defendant has moved for summary judgment on Plaintiff's claim against it of fraudulent

inducement to enter into a contract of employment.  "Under New York law,[8] at-will employees

cannot evade the bar against suing for wrongful termination by suing in tort.  In addition,

plaintiffs cannot masquerade a breach of contract claim as a fraud claim."  Jelks v. Citibank,

N.A., 99 Civ. 2955, 2001 U.S. Dist. LEXIS 381, at *8-9 (S.D.N.Y. Jan. 22, 2001) (citations

omitted).  "Under very limited circumstances, however, at-will employees can recover for

fraudulent statements that induce them into accepting positions of employment by showing: (1) a

material false representation; (2) scienter; (3) reasonable reliance; (4) damages; and, relevant

here, (5) that the fraudulent misrepresentation was collateral or extraneous to the employment

agreement."  Id. at *9 (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d

13, 19-20 (2d Cir. 1996); Stewart v. Jackson & Nash, 976 F.2d 86, 88-90 (2d Cir. 1992)).

Plaintiff's claimed misrepresentation is that Defendant offered her a job that it knew did

not exist, since all of Plaintiff's job responsibilities had previously been assigned to another

Nokia employee, John Mason.  See generally Mem. of Law in Opp. to Def.'s Mot. for S.J.

(Docket # 40) at 5-10.  She points to the job advertisement for her position of Channel Marketing

Director (which she refers to as Global Channel Marketing Director throughout her motion

papers, though she does not offer substantiation for this title), and states that "at the time she was

hired to serve as Global Channel Marketing Director, with the job responsibilities set forth in the

job description with which she was provided, those responsibilities had already been given to

---

[8]The parties' briefs assume that New York law governs resolution of both the claim and
the counterclaim, and their implied consent suffices to establish the applicable choice of law.
Golden Pacific Bancorp v. F.D.I.C., 273 F.3d 509, 514 n.4 (2d Cir. 2001) (citation omitted).

another employee, John Mason."  Mem. of Law in Opp. to Def.'s Mot. for S.J. at 3.  However, Plaintiff fails to attribute this misrepresentation to any particular individual.  Rather, it would seem that the misrepresentation was made by everyone involved in hiring her, since she claims that her understanding of her job responsibilities came from the job advertisement, the "thank you" notes she sent to her interviewers, and the channel marketing action plan which she drafted and which was distributed to all of those who interviewed her for the position of Channel Marketing Director.  See Am. Compl. Exs. B, C, D; Egan Aff. Ex. A (Lennon Depo.) at 95-96, 111; Egan Aff. Ex. D (Defendant's Amended Objections and Answers to Plaintiff's Amended First Set of Interrogatories to Margarete Roos) at 7 (Plaintiff's job description was prepared by Barry Issberner).  Such a theory is simply not sustainable, as there is no evidence in the record to support a claim that all of those individuals acted with intent to fraudulently induce Plaintiff's acceptance of the position of Channel Marketing Director.  See Carruthers v. Flaum, 450 F. Supp. 2d 288, 315-16 (S.D.N.Y. 2006) ("[P]laintiffs offer no evidence that [defendant] made any sort of representation with knowledge of its falsity – or, in this particular case, with the intent not to perform.  Evidence about a defendant's state of mind must be proffered to survive summary judgment, and the burden of producing evidence regarding the defendant's fraudulent intent lies squarely on the plaintiffs.") (citing U.S. East Telecomms., Inc. v. U.S. West Commc'ns Servs., Inc., 38 F.3d 1289, 1302 (2d Cir.1994)).

Insofar as Plaintiff alleges that the misrepresentation lay in the fact that John Mason had already been given her job, there is no evidence in the record to explain how anyone involved in his hire was involved in her hire, in order to substantiate a claim that any such person was engaged in fraud.  Indeed, the record indicates that, with respect to her hire, Plaintiff dealt most

extensively with Barry Issberner.  See Egan Aff. Ex. A (Lennon Depo.) at 92 (after submitting

her resume, Plaintiff had initial phone interview with hiring manager, Barry Issberner), 94-96,

98, 109-11 (Plaintiff met with Issberner in California, and he made a verbal job offer); Goldring

Decl. Ex. A (Lennon Depo.) at 93, 107-08 (Plaintiff was given assurances from Issberner

regarding the job: "[W]e had thoroughly discussed the job and it was not what that job evolved

to.").  However, she provides no evidence that Issberner was involved in Mason's hire or that he

would have known, at the time Plaintiff was hired, that Mason had already been hired to fill

Plaintiff's job.  Nor does Plaintiff provide any other evidence that Issberner fraudulently induced

her to enter into an employment agreement with Defendant by offering her a job that he knew did

not exist.  In fact, the Amended Complaint alleges, "Mr. Issberner recognized and confirmed to

Plaintiff that Mr. Mason was frustrating Plaintiff's employment with Nokia and that Mr. Mason

was mainly responsible for diminishing the scope of responsibilities and control to which he had

hired Plaintiff for."  Am. Compl. ¶ 29.  In other words, according to Plaintiff, Issberner fully

intended to hire Plaintiff for the Channel Marketing Director position as it was understood by

Plaintiff; any limitations placed on that employment occurred after she had been hired, i.e.,

Issberner did not make a misrepresentation of present fact when he hired Plaintiff.  See Stewart

v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992) ("To the extent the representations were of

present fact, they were actionable under a theory of fraudulent inducement.") (citation omitted).

Plaintiff further alleges that the Global Channel Organization proposal dated February 2,

2006, drafted by Mr. Mason, serves as evidence of the fraud.  However, David Petts, to whom

that document was sent for approval, see Lennon Aff. Ex. 7 at 1 ("David . . . Please let me know

if you support this, and/or any modifications you would like to see.  Once I have your go-ahead,

I'll post the positions with job descriptions."), was in no way involved in Plaintiff's hire.  <u>See</u>
Egan Aff. Ex. E (Defendant's Objections and Answers to Plaintiff's First Set of Interrogatories to
Defendant) at 5 (employees involved in hiring process for Plaintiff were Barry Issberner, Tiffany
Holmes, John Mason, Sudeshna Nayar, Ron Geschwer, Klaus Siebold, Gord Boyce, Olivier
Cognet, Margarete Roos, and Chris Fletcher); <u>see</u> <u>also</u> Am. Compl. Ex. D ("thank you" notes);
Egan Aff. Ex. A (Lennon Depo.) at 95-109 (testimony regarding interviews).  Moreover, to the
extent that Mason was allegedly involved in hiring other people to perform Plaintiff's job
responsibilities, Mem. of Law in Opp. to Def.'s Mot. for S.J. at 8 ("All of the functions in
Lennon's job description were to be performed by members of the channel team hired by Mason
and not, as Lennon's job description indicates, by Lennon."), he was not the person who drafted
Plaintiff's job description in the first place, Egan Aff. Ex. D (Defendant's Amended Objections
and Answers to Plaintiff's Amended First Set of Interrogatories to Margarete Roos) at 7
(Plaintiff's job description was prepared by Barry Issberner), nor does Plaintiff provide proof of
any particular misrepresentation made to her by Mason when he interviewed her for her position.
<u>See</u> Goldring Decl. Ex. A (Lennon Depo.) at 105-06.[9]

---

[9]Nor does the documentary evidence cited by Plaintiff establish her allegations.  A
comparison of Plaintiff's job description, Lennon Aff. Ex. 1, with Mason's job requisition,
Lennon Aff. Ex. 17, shows that they do not describe the same job.  For example, the Channel
Marketing Director candidate would "help develop and craft the channel marketing programs and
materials related to the recruitment and development of channel partners" and was required to
have "8-10+ years experience in IT channel marketing," while the Global Head of Channels
would "lead a holistic channels/partnering organization both at a world wide level and through
the regions" and would, "with his/her Global team . . . define, implement and manage the
channel/partnering/operator strategy for [Enterprise Solutions] across all partner types" and was
required to have "[a]t least fifteen years proven track record of high tech. product sales
experience with channel partners i.e. PC, server or mobile devices."  While the Channel
Marketing Director candidate was to be a "[s]elf-starter, team player," the Global Head of
Channels candidate was to have "demonstrated leadership capabilities with strong, positive

Not only is evidence lacking that any misrepresentations were made to Plaintiff in connection with her hiring, but where, as here, Plaintiff's claim of fraudulent inducement is that Defendant hired her for a nonexistent job, "[o]ne would have to theorize broadly that the job offer alone was fraudulent because no such position existed, or if it did, was soon to be eliminated.  However, a job offer is by definition central, not collateral, to the employment agreement itself, and accordingly a hidden intention not to perform gives rise to a breach of contract claim, not a fraud claim."  Jelks, 2001 U.S. Dist. LEXIS 381, at *11 (citations omitted); see Int'l CableTel Inc. v. Le Groupe Videotron Ltee, 978 F. Supp. 483, 487 (S.D.N.Y. 1997) ("[A] false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties.") (citing cases).  Plaintiff's own brief highlights the internal inconsistency of her claim, where, in refuting Defendant's argument that she failed to plead fraud with particularity, Plaintiff states, "The offer letter attached as Exhibit E to the Amended Complaint also contains a misrepresentation as to [the] job Lennon would be performing, i.e. 'Channel Marketing Director.' " Mem. of Law in Opp. to Def.'s Mot. for S.J. at 18.

---

interpersonal skills."

Moreover, while Plaintiff contends that the functional chart included at page 5 of the Global Channel Organization proposal indicates that others were to be given job responsibilities which had been included in her job description, and that the job responsibilities listed under her name were not the same as those included in her job description, compare Lennon Aff. Ex. 1 with Lennon Aff. Ex. 7 at 5, Mr. Petts stated at his deposition, "They're not all positions. Actually, in fact, it says at the top, not an organizational chart.  This was more the functions or tasks that [Mason] was dividing into groups that needed to be completed."  Egan Aff. Ex. B at 54; see also Egan Aff. Ex. C (Mason Depo.) at 138 (the priorities in the chart do not "necessarily mean hiring someone, it could mean assigning that responsibility to someone").  In addition, as previously noted, Mason had nothing to do with the creation of Plaintiff's job description, and therefore, it is not at all certain that he was aware of its contents when he drafted this proposal.

14

In addition, even viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in her favor, as the Court must do in deciding Defendant's motion, Plaintiff's assertion that Defendant misrepresented the existence of her job is belied by her deposition testimony, see Goldring Decl. Ex. A. (Lennon Depo.) at 135 (in the first month of her employment, the job was living up to Plaintiff's expectations), as well as her written review for the period of January 23, 2006, to June 30, 2006.  See Am. Compl. Ex. H.  In that document, Plaintiff's objectives are described as, "Develop preliminary channel partner framework", "Develop detailed channel partner program implementation plan", "Develop channel recruitment materials, welcome kits, collateral", "Internally announce channel partner program framework," and "Plan and prepare Channel Conferences."  Id.  These objectives correspond to Plaintiff's job description, which, among other things, states that the Channel Marketing Director "will help develop and craft the channel marketing programs and materials related to the recruitment and development of channel partners," Lennon Aff. Ex. 1, as well as to Plaintiff's understanding of her job responsibilities as evidenced by her interview "thank you" notes, Am. Compl. Ex. D, and her Channel Marketing Action Plan.  Id. Ex. C.

In Plaintiff's written review, under each of the objectives is a description of what had been achieved, and the entries reflected the fact that Plaintiff's work had been committed to furthering these objectives.  In the concluding section entitled, "My Comments," on June 13, 2006, Plaintiff wrote,

> Employee/manager feedback has been a challenge in that my direct manager is not the owner of the partner program or accountable for the Channel Conferences.  Barry [Issberner] has been very supportive when I asked his guidance, but John Mason owns the program and conferences and my effectiveness and success require direct guidance and direction

> from him.[10]  Without regular guidance and direction from him, it was
> difficult to know or meet his expectations (though I believe I have).  He is
> new to Nokia and is understaffed and based in a time-zone that was 9
> hours ahead of mine making it very difficult to communicate and align.
> He has alot [sic] on his plate with the entire distribution and channel
> strategy with the Partner Program being just one piece of the puzzle.  I am
> hoping it will be easier to communicate and align with John once we are
> both based in White Plains.

Am. Compl. Ex. H.  Plaintiff nowhere indicated in the review, either explicitly or implicitly, that

Mason had usurped her job responsibilities, either himself, or by hiring others.  Furthermore,

Plaintiff's direct manager, Barry Issberner, who added his comments to the review on July 7,

2006, stated,

> In my view, Deborah is obviously very familiar with all elements of
> Channel Development programs and has a very complete plan of attack.
> Getting through all the decisions necessary to bring our vision into reality
> has been a challenge.  Much of this is out of Deborah's direct control.  I
> have advised Deborah on how to deal with the obvious frustrations that
> this brings up and she has adjusted her style appropriately in my view.
> The pressures on the whole channel team are only going to increase in Q3
> as we close in on the live Channel Conferences.  A review with David
> Petts is schedule[d] for next week and should help identify how to close
> the remaining open issues.  I am confident Deborah has the experience and
> drive to do her part here.

Id.  There was nothing in Issberner's comments to indicate either that Plaintiff's job

responsibilities were being usurped or that she believed this to be the case.  Thus, while it is

undisputed that Plaintiff's job responsibilities were refocused after the July 11, 2006, meeting,

---

[10]Plaintiff cites to Mason's deposition testimony to argue that his area of responsibility
included tasks "drawn directly from Ms. Lennon's job description."  Mem. of Law in Opp. to
Def.'s Mot. for S.J. at 6.  However, given Mason's "ownership" of the partner program and the
Channel Conferences, and the fact that Plaintiff was supposed to take direction from him with
respect to same, it is not surprising that he had responsibilities in areas which touched upon
Plaintiff's job responsibilities.  Additionally, the fact that Plaintiff was to take direction from
Mason negates the assertion that he was given her job.

that fact does not prove that Defendant made a misrepresentation as to the existence of Plaintiff's job over six months earlier.  See Goldring Decl. Ex. A (Lennon Depo.) at 169 ("I would never have relocated from California and uprooted myself from my professional and my social community with a job *that this evolved into* for the marketing focus.") (emphasis added); Stewart, 976 F.2d at 90 (only representations of present fact are actionable under fraudulent inducement theory).

Plaintiff's argument that "Nokia officials made misrepresentations to induce Lennon to enter into collateral agreements," e.g., the relocation agreement, Mem. of Law in Opp. to Def.'s Mot. for S.J. at 12, is not the same as establishing that Defendant made misrepresentations that were collateral to her employment agreement, and indeed, Plaintiff's obligation to sign the relocation agreement was part of her offer letter.  See Lennon Aff. Ex. 5 ("Relocated employees are required to sign a Relocation Agreement which outlines repayment responsibility should termination occur within one year of relocating.  Please sign and return the Relocation Agreement with your signed offer letter.").  The alleged frustration of Plaintiff's ability to perform her job once her employment began is not an actionable misrepresentation as to the existence of that job designed to induce her into accepting such employment.

In sum, Plaintiff has failed to raise an issue of fact with respect to her fraudulent inducement claim, and summary judgment in Defendant's favor is appropriate.[11]

---

[11]To the extent that Plaintiff tries to assert a breach of contract claim in her opposition brief, the Court shall not entertain such a claim.  There has apparently been some confusion regarding the claim or claims being asserted by Plaintiff due to the fact that she has been represented by two different attorneys over the course of the litigation.  Thus, the only claims discernable in the Amended Complaint, which was prepared by Plaintiff's original attorney, are for breach of an implied employment contract based on Defendant's termination of Plaintiff's employment "without cause," Am. Compl. ¶ 48, and for promissory estoppel, id. ¶ 49.  However,

III.   **Motions for Summary Judgment on Breach of Contract Counterclaim**

Defendant also moves, and Plaintiff cross-moves, for summary judgment on the

counterclaim for breach of contract based on Plaintiff's failure to repay Defendant amounts

---

it appears that Plaintiff's subsequent counsel took the case in a different direction. Thus, Plaintiff's new counsel stated during the September 19, 2008, court conference, that all of the discovery had been directed towards a fraudulent inducement claim: "That's what everything has been focused on is whether or not the job that [Plaintiff] was promised . . . had, in fact, been given away to someone else before she was hired." Goldring Decl. in Supp. of Def.'s Reply (Docket # 53) Ex. B at 15. When Defendant's attorney stated, "As long as there's not breach of contract, breach of implied contract," id. at 15-16, Plaintiff's attorney stated, "I don't think there's any of those things. . . . I have been pursuing it as a fraudulent in the inducement [sic] case." Id. at 16.

Nonetheless, in her opposition brief, Plaintiff now asserts a breach of contract claim based on the fact that in its offer letter, Defendant "promised Lennon the position of Global Channel Marketing Director. . . . [but] when Lennon arrived at Nokia, she was not given the opportunity to fulfill those duties and was treated as if she had been hired for a completely different position. . . . The breach was not the termination of employment but the failure to provide her the Global Channel Marketing Director position in the first instance." Mem. of Law in Opp. to Def.'s Mot. for S.J. at 16; see also, e.g., Plaintiff's Opp. 56.1 Statement ¶ 35 ("Lennon's claim is for fraud in the inducement and promissory fraud. Further, Lennon complains that Nokia never allowed her to perform the job for which she moved; this was a breach. It was not the termination which was the breach, but the breach occurred when Nokia did not allow her to perform a Global Channel Marketing Director role.").

"Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (internal quotation marks and citations omitted).

Where, as here, the discovery has been directed towards a fraudulent inducement claim, and Plaintiff's attorney has represented that there is no other claim in the case, Plaintiff cannot belatedly assert a breach of contract claim. Notably, the allegations made in support of Plaintiff's belated breach of contract claim are the same as those made in support of her fraudulent inducement claim, thereby highlighting the weakness of that claim, i.e., that Plaintiff has sought to "masquerade a breach of contract claim as a fraud claim." Jelks, 2001 U.S. Dist. LEXIS 381, at *9.

allegedly due and owing pursuant to the terms of the relocation agreement.[12]  The relocation agreement stated that if Plaintiff were "discharged for disciplinary action," or if she were to "voluntarily terminate [her] employment . . . prior to twelve (12) months from the date of relocation," she would have to reimburse Defendant "for any and all expenses" related to the relocation based on a table of percentages set forth in the agreement.  Goldring Decl. Ex. A (Lennon Depo.) Ex. G.  Plaintiff argues that she was neither discharged for a disciplinary reason (a point apparently conceded by Defendant, who only argues that Plaintiff voluntarily terminated her employment) nor did she voluntarily terminate her employment with Defendant within twelve months of her relocation; therefore, Defendant has no right to reimbursement.  Plaintiff further argues that the Administrative Law Judge ("ALJ") in her unemployment insurance proceeding conclusively decided that she did not voluntarily terminate her employment and, since such decision is entitled to collateral estoppel effect, summary judgment should be granted in her favor on Defendant's counterclaim.

For its part, Defendant contends that Plaintiff's conduct in November, 2006, constituted a voluntary termination as per the Nokia Handbook.  The Handbook states that "[u]nreported absences of 3 consecutive days will be considered a voluntary termination."  Lennon Depo. Ex. I at 9.  Defendant argues that Plaintiff's failure to report to work on November 8, 9, or 10, 2006, without notice to anyone at Nokia, qualifies as a voluntary termination.  Consequently, she is required to reimburse Defendant for her relocation expenses.

---

[12]While Defendant argues that Plaintiff's cross-motion should be rejected as untimely and unauthorized, Defendant fails to show that it has been prejudiced in any way by its filing. Rather, Defendant has had ample opportunity to respond to the cross-motion, and it is in the interests of justice and judicial economy that the Court consider both parties' motions.

Following her termination from employment with Defendant, Plaintiff filed a claim for unemployment insurance benefits.  A Notice of Determination dated October 2, 2007, denied Plaintiff benefits on the ground that she "quit [her] job without good cause."  Lennon Reply Aff. (Docket # 58) Ex. B.  By way of explanation, the Notice states, "You quit your job with Nokia Inc on 11/8/06 because you had not contacted your employer for being absent since 11/8/06. You did not offer a compelling reason why you did not contact your employer for being absent. You also did not intent [sic] to contact your employer after you received a termination letter. You quit where there was continuing work available for personal and non-compelling reasons." Id.  In addition, the Notice includes a "Determination of Wilful Misrepresentation," finding that Plaintiff made false statements:  "You reported that you called in for being absent, when you knew you did not call your employer for being absent on 11/8/06, 11/9/06, 11/10/06."  Id.

Plaintiff objected to these determinations and requested a hearing before an ALJ.  See Lennon Aff. Ex. 13.  A hearing was held, at which only Plaintiff appeared.  Id. Ex. 15; Goldring Decl. in Supp. of Def.'s Reply (Docket # 53) Ex. A.  The only issue to be determined by the ALJ was "[l]oss of employment through misconduct."  Lennon Aff. Ex. 15.  As noted by the ALJ, "Pursuant to Labor Law § 593(3), a claimant is disqualified from receiving benefits after having lost employment through misconduct in connection with that employment."  Id.  The ALJ proceeded to overrule the initial determination, concluding, "The credible evidence establishes that the employer discharged the claimant for not contacting them about her absence. Significantly, the claimant had contacted her supervisor and had taken sick time that she had accrued.  The employer discharged the claimant prior to her providing them with a doctor's note. Accordingly, I find that the claimant's actions did not rise to misconduct."  Id.  Plaintiff argues

20

that this finding – that Plaintiff did not engage in misconduct – is the same as a determination that she did not voluntarily terminate her employment, and that it collaterally estops Defendant from pursuing its counterclaim herein.

As the Second Circuit has stated,

> When a state administrative agency, acting in a judicial capacity, resolves disputed issues of fact properly before it, which the parties had an adequate opportunity to litigate, a federal court must give the agency's fact-finding the same preclusive effect to which it would have been entitled in the state's courts.  New York courts give collateral estoppel effect to decisions of administrative agencies, provided the person against whom the doctrine is urged had the incentive and the opportunity to participate in the administrative decision-making process and the issue in the second proceeding is the same as the issue in the administrative proceeding.  The party against whom the doctrine is urged has the burden of negating the first issue.  The party urging application of the doctrine has the burden of proving the second.

Fondel v. Grumman Aerospace Corp., 884 F.2d 657, 658-59 (2d Cir. 1989) (citations omitted).

Here, Defendant notes that it "did not participate and was not present at the hearing." Mem. of Law in Opp. to Pl.'s Mot. for S.J. at 5 n.5.  Plaintiff concedes that Defendant was not present at the hearing, but claims that it did participate, based on the reasoning provided in the initial determination denying benefits, which "gives Nokia's analysis as its reason for denying Lennon benefits."  Reply Mem. of Law in Supp. of Pl.'s Mot. for S.J. at 8.  Plaintiff further argues that though she "does not have a copy of what Nokia submitted, the New York State Labor Department can only have arrived at this conclusion following the submission of arguments by Nokia to the Department of Labor."  Id. at 9.  However, there is no evidence that Defendant in any way participated in the proceedings before the ALJ, whose determination Plaintiff claims is entitled to collateral estoppel effect.

Furthermore, Plaintiff claims that the ALJ determined that she did not resign and that "[t]his determination was essential to the judgment granting her unemployment benefits because had Nokia prevailed in its argument that she resigned she would not have been eligible for benefits."  Mem. of Law in Supp. of Pl.'s Mot. for S.J. at 9-10.  However, the ALJ's decision nowhere states that it is based on a finding that Plaintiff did not resign from her job.  Rather, the ALJ states that the initial determination disqualified Plaintiff from receiving benefits "on the basis that [she] lost employment through misconduct."  Lennon Aff. Ex. 15.  Indeed, as noted above, the ALJ framed the issue as whether Plaintiff lost her employment through misconduct.  The ALJ did not address whether Plaintiff had voluntarily terminated her employment within the meaning of either the Nokia Handbook or the relocation agreement.  Therefore, the ALJ's decision does not collaterally estop Defendant from asserting its counterclaim herein.  Cf. In re McKoy, 810 N.Y.S.2d 585 (N.Y. App. Div. 2006) ("The violation of an employer's rule or policy, while sufficient to justify termination of employment, does not necessarily rise to the level of disqualifying misconduct.  For a claimant's actions to equal disqualifying misconduct under the Labor Law, those actions must display 'a willful and wanton disregard of the employer's interest.' ") (citations omitted).

The counterclaim is for a breach of contract which, under New York law, "requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  Pomroy v. Conopco, Inc., 06 Civ. 2037, 2007 U.S. Dist. LEXIS 11323, at *32 (S.D.N.Y. Feb. 12, 2007) (quoting First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)) (internal quotation marks omitted).  Plaintiff acknowledges that she received and signed the relocation agreement.  See Lennon Aff. ¶ 12.  She does not dispute that Defendant

22

paid at least some of her relocation expenses.  Id.[13]  Plaintiff also admits that she did not call in to

anyone at Nokia on either November 8, 9, or 10, 2006, to report that she was not going to be at

work.  See Goldring Decl. Ex. A (Lennon Depo.) at 190-91.  Thus, as Plaintiff states in her reply

brief on her cross-motion, "[T]he only issue is whether Ms. Lennon voluntarily terminated her

employment, [and] a decision that she did or did not determines who is entitled to judgment on

the counterclaim."  Reply Mem. of Law in Supp. of Pl.'s Mot. for S.J. at 3.  Plaintiff later adds,

"It is clear that Ms. Lennon did not come to work.  The only issue remaining for the Court is

whether that act constitutes a 'voluntary' resignation as that term is used in the Relocation

Agreement, which is clearly a question of law for the Court."  Id. at 3 n.2.[14]

Plaintiff does not claim that the relocation agreement is in any way ambiguous, and it

clearly states that if Plaintiff were to "voluntarily terminate" her employment with Defendant

prior to 12 months from the date of relocation that she would reimburse Defendant for any and

all relocation expenses as set forth therein.  Lennon Aff. Ex. 6.  Likewise, the statement in the

Nokia Handbook that "[u]nreported absences of 3 consecutive days will be considered a

voluntary termination," Lennon Depo. Ex. I, is clear and unambiguous.  Plaintiff provides no

reason, nor can the Court find one, why the words "voluntary termination" as used in the

Handbook would have a different meaning from the words "voluntarily terminate" as used in the

---

[13]At the September 19, 2008, court conference, the parties agreed that discovery regarding
damages would take place after decision on the summary judgment motions.  Goldring Decl. in
Supp. of Def.'s Reply (Docket # 53) Ex. B at 2-3.

[14]Plaintiff testified at her deposition that she did not report her absences based on the
advice of her attorney.  Lennon Depo. at 191.  However, she nowhere argues that this negates a
finding that the three consecutive days of unreported absences constituted a voluntary
termination.

relocation agreement.  Therefore, Defendant is entitled to summary judgment on its counterclaim for breach of contract.[15]

## CONCLUSION

For the above-stated reasons, Defendant's motion for summary judgment (Docket # 29) is granted, and Plaintiff's cross-motion for summary judgment (Docket # 47) is denied.  Counsel are directed to appear at a conference with the Court on April 15, 2009, at 10A.M. to set a schedule for discovery on the issue of damages recoverable on the counterclaim.

Dated: March 24, 2009
       White Plains, New York

SO ORDERED,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

---

[15]Because the Court finds that Plaintiff breached the relocation agreement by voluntarily terminating her employment within 12 months of the date of relocation, it need not decide whether she was ineligible for relocation assistance based on her failure to work full-time in White Plains for 39 weeks, as set forth in the relocation policy.

24